**Paul Christian BLUMBERG, Petitioner,**

v.

**Silvia GARCIA, Warden, Respondent.**

**No. CV 04–8146–CAS (SH).**

United States District Court, C.D. California, Western Division.

Feb. 7, 2010.

Tracy J. Dressner, Tracy J. Dressner Law Offices, La Crescenta, CA, for Petitioner.

David A. Voet, Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ADOPTING THE AMENDED REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

CHRISTINA A. SNYDER, District Judge.

Pursuant to 28 U.S.C. Section 636(b)(1)(C), the Court has reviewed the Petition, all of the records and files herein and the attached Amended Report and Recommendation of the United States Magistrate Judge, and has made a *de novo* determination of the Amended Report and Recommendation and Response of the Magistrate Judge to Respondent's Objections. The Court concurs with and adopts the conclusions of the Magistrate Judge.

IT IS ORDERED that the Petitioner's claims for habeas relief and cumulative error are granted, and that Petitioner be released from custody, unless new trial proceedings are commenced within 90 days after entry of Judgment.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Amended Report and Recommendation, Response of the Magistrate Judge to Respondent's Objections and the Judgment herein by the United States mail on petitioner, counsel for petitioner and respondent.

LET JUDGMENT BE ENTERED ACCORDINGLY.

## AMENDED REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

STEPHEN J. HILLMAN, United States Magistrate Judge.

This amended report and recommendation[1] is submitted to the Honorable Christina A. Snyder, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and General Order No. 05–07 of the United States District Court for the Central District of California. For the reasons discussed below, the magistrate judge recommends that the petition be granted.

### *PROCEDURAL BACKGROUND*

Petitioner, a prisoner in the custody of the California Department of Corrections, represented by counsel, challenges his conviction in Los Angeles Superior Court (Case No. MA015042).

On June 9, 1998, Petitioner was convicted by a jury of conspiracy to commit murder, attempted murder, and assault with a semiautomatic firearm in violation of California Penal Code ("PC") §§ 182(a) (1), 664/187(a) and 245(b), respectively. [Clerk's Transcript ("CT") at 259–62; Reporter's Transcript ("RT") at 1704–12.] The jury also found "true" the allegations that the attempted murder and assault were committed for the benefit of a criminal street gang and that a principal was armed with a firearm during the commission of the attempted murder, in violation of PC §§ 186.22(b)(1) and 12022(a)(1). [CT at 259–62; RT at 1704–12.] On September 9, 1998, Petitioner was sentenced to an aggregate term of twenty-six years

---

1. As detailed below, an initial report and recommendation recommending that the Petition be denied was filed by Magistrate Judge McMahon on December 19, 2005. On the day Objections were filed, the Petition was reassigned to the undersigned Magistrate

Judge due to Judge McMahon's retirement. After independent review of the record and an evidentiary hearing, this Amended Report and Recommendation issues recommending that the Petition be granted.

to life in state prison. [CT at 336–38, 352; RT at 1760–66.]

Petitioner appealed his conviction to the California Court of Appeal. [CT at 353; Lodgment ("Lodg.") Nos. 3–6.] In an unpublished opinion filed on February 3, 2000, and modified March 2, 2000, the California Court of Appeal stayed a one-year portion of the sentence, ordered the abstract of judgment modified in certain respects, but otherwise affirmed the judgment in full. [Lodg. No. 7.] On May 17, 2000, the California Supreme Court denied review without comment or citation to authority. [Lodg. Nos. 8, 9.]

Petitioner sought collateral review in the Los Angeles Superior Court, which denied relief in a reasoned order filed July 31, 2002. [Pet., Ex. R; Lodg. Nos. 10, 11.] Petitioner pursued collateral review in the California Court of Appeal, which denied relief in an unpublished decision on September 15, 2003. [Pet., Ex. S; Lodg. Nos. 12, 14.] Petitioner's petition for habeas relief in the California Supreme Court was summarily denied on September 22, 2004. [Pet., Ex. T; Lodg. Nos. 15, 16.]

On September 29, 2004, Petitioner, represented by counsel, filed the present habeas corpus petition. Respondent's answer was filed on April 5, 2005; Petitioner's traverse was filed on May 31, 2005.

On December 19, 2005, Magistrate Judge McMahon filed a Report and Recommendation recommending that the Petition be denied in its entirety with prejudice. Upon the filing of Petitioner's objections ("Obj."), the matter was reassigned to the undersigned Magistrate Judge for all further proceedings. On February 26, 2006, the court ordered respondent to file a reply to the objections. On June 9, 2006, respondent filed his reply ("Reply").

After independent review of the pleadings and the record, in an Order dated January 26, 2007 ("Order Re: Further Proceedings"), the undersigned Magistrate Judge concluded that the initial Report and Recommendation did not fully address Petitioner's claims, and that Petitioner had alleged facts, which if true, entitled him to relief, and that an evidentiary hearing may be warranted. The court directed Respondent to file a Supplemental Answer.

On April 30, 2007, Respondent filed a Supplemental Answer ("Supp. Ans."). Pursuant to a stipulation of the parties, on July 10, 2007, the court ordered discovery. On December 6, 2007, the court determined that an evidentiary hearing was required. Respondent filed a "Partial Supplemental Answer" on April 10, 2008. After several status conferences regarding discovery and scheduling, both parties filed pre-evidentiary hearing briefs on May 28, 2008. The evidentiary hearing was held on June 3, 2008.

On June 12, 2008, Petitioner moved to expand the record ("MER"). Respondent filed an opposition to the motion ("Opp. MER") on July 10, 2008; Petitioner filed a reply ("Rep. MER") on July 18, 2008. On September 15, 2008, the court issued an order granting the motion to expand the record.

Petitioner filed a post-evidentiary hearing brief ("Pet. PEHB") on September 15, 2008. Respondent filed a post-evidentiary hearing brief ("Resp. PEHB") on October 30, 2008. Petitioner filed a reply ("Rep. PEHB") on December 5, 2008.

The matter has been submitted and is ready for decision.

### PETITIONER'S CLAIMS FOR RELIEF

Petitioner alleges the following grounds for relief: [2]

---

2. Subsequent to the reassignment of the petition to the undersigned Magistrate Judge, Petitioner withdrew Claims Three (ineffective assistance of trial counsel) and Four (viola-

1. The key prosecution witnesses—Los Angeles County Deputy Sheriff Brad Foss, Los Angeles Police Officer Brian Hewitt, and Jose Reyes—provided false testimony at trial [Claim One: Pet. at 13–37];

2. The prosecution violated *Brady*, presented false evidence, and impermissibly vouched for prosecution witnesses [Claim Two: Pet. at 38–43]; and

3. The errors in this case, both individually and cumulatively, rendered petitioner's trial fundamentally unfair [Claim Five: Pet. at 50–52.]

### *FACTUAL SUMMARY* [3]

A. *Trial*

1. *Case-in-chief*

tion of right of presence) of the Petition. [Transcript of Evidentiary Hearing on June 3, 2008 ("EHT") at 78; Pet. PEHB at 1 n. 1.] Additionally, in his Objections to the initial Report and Recommendation, Petitioner clarified that "Claim Six" was not intended to state a freestanding claim, but rather a discussion of the legal standards applicable on federal habeas review. [Obj. at 51–52.] In light of Petitioner's representations, these claims (all of which were rejected in the initial Report and Recommendation) are not addressed herein.

3. The factual summary is drawn from the pleadings and the court's own independent review of the record. Additional factual background is set forth below where relevant to specific claims.

4. Michael Blumberg was at large at the time of Petitioner's trial.

5. Zuniga admitted that he was a member of the BLC gang on the day of the shooting, but not an "active" member. [RT at 104, 110.] Zuniga's mother testified that Zuniga had returned to the Antelope Valley about a month before the confrontation after living in Virginia for two years. She testified that she sent Zuniga to live with his father in Virginia in September, 1996, after learning that Zuniga was a gang member. [RT at 197–98.]

6. The record reflects that Zuniga was inconsistent over time as to what was said to him

At about 3:00 p.m. on October 29, 1997, Petitioner and his older half—brother, Michael Blumberg ("Michael")[4], were driving on "J–8" in Lancaster, California. Michael, who was sitting in the front passenger seat, yelled out to a pedestrian, Ramon Zuniga ("Zuniga"). Zuniga was wearing a baseball cap with the letters "BLC" on the front and "Maldito" on the back. "BLC" is the acronym for the "Barrio Lorenzo Cardenas" gang, of which Zuniga was a member; "Maldito" is Zuniga's gang name (moniker).[5] Zuniga had not seen Petitioner or Michael before that day. As Petitioner drove past Zuniga, Michael yelled out to Zuniga, asking him if he "wanted shit." Someone in the car also yelled out "it's all about Temple Street."[6] Zuniga

by either or both of the occupants of the car, as well as the particulars of the assault. For example, on direct examination, Zuniga initially testified that "they asked me if I wanted shit, and they were yelling 'it's all about Temple Street.'" Zuniga identified "they" as "the defendant and his brother." [RT at 106.] When asked specifically who said what, Zuniga stated that Michael spoke first, asking whether Zuniga "wanted shit." Zuniga stated that Petitioner spoke next, but Zuniga could not recall what Petitioner said. Zuniga then stated that Michael said "it's all about Temple Street," and that Petitioner also said "it's all about Temple Street." Zuniga testified that Michael spoke next, calling him a "pussy." Zuniga could not recall what was said next. [RT at 107–108.] Zuniga testified that "they" were glaring at him and trying to intimidate him as they drove by; later he stated that the passenger did so. [RT at 111, 113.] Los Angeles County Sheriff's Deputy Miguel Torres (who spoke to Zuniga at the scene before paramedics arrived) and Foss (who spoke to Zuniga the day after the shooting) both testified that Zuniga stated that the occupants of the car asked him "where he was from," that he responded "from nowhere," and that the occupants called him a "bitch." [RT at 389–92 (Torres); 603 (Foss).] Zuniga had no recollection at trial of being asked "where are you from" or being called a "bitch." [RT at 107–08, 123–24.] Zuniga denied or did not recall making certain state-

believed that he was being challenged and threatened. He responded that he did not "want no problems." [RT 104–09, 111.]

Petitioner continued driving, and turned right on Fine Street, the first street he came to after the exchange.[7] Shortly after, Petitioner drove by Zuniga again. Petitioner stopped at a stop sign after passing Zuniga. When Petitioner stopped, Michael got out of the car. Petitioner turned right at the corner and drove away.

Michael approached Zuniga on foot, stating "it's about Temple Street" and "fuck BLC," and shot at Zuniga. Zuniga did not see a gun in Michael's hand before he was shot. [RT at 111, 115–19, 135.]. Zuniga was shot several times; including in the back, stomach, elbow, and twice in the chest. [RT at 195.] He survived his injuries, and later identified Petitioner as the driver at a line-up[8] and at trial. [RT at 105, 572.]

ments attributed to him by Torres and Foss. [RT at 123–24, 134–35, 141.]

Additionally, Zuniga's accounts shortly after the shooting varied from each other and certain of his trial testimony. For example, according to Torres, Zuniga stated that he was chased with a gun [RT at 392]; Zuniga testified that Michael shot as Zuniga was trying to pass by him, and that he did not see a gun before then. [RT at 119, 135.] According to Foss, Zuniga stated that the shooter had both hands in his pockets [RT at 603–04]; Zuniga testified at trial that Michael's hands were out of his pockets. [RT at 135.] While hospitalized(and apparently after speaking to Foss), Zuniga told his teacher, Steven Edwards, that after one person got out of the car, the other drove the car behind him to block him in, and then the shooting started. [RT at 521–22.] At trial, Zuniga testified that each time he was questioned he described the shooting to the best of his recollection. [RT at 123, 134, 153.]

7. Prosecution witness Michael Rasmussen testified that he was driving one car behind Petitioner's. Rasmussen observed the passenger in Petitioner's car talking and making "provoking gestures" to a pedestrian who was walking parallel to Petitioner's car. Rasmussen did not observe the pedestrian, who kept walking, respond in kind. Rasmussen became impatient and honked his horn at Petitioner, who he considered to be obstructing the flow of traffic. Shortly after, Petitioner turned right at the next street; Rasmussen kept going. [RT at 156–57.] Zuniga, on the other hand, mentioned no such gestures, and described the confrontation as only verbal. [RT at 188.]

8. The circumstances surrounding the lineup and whether or not Petitioner purposefully

altered his appearance in violation of a court order was the subject of much discussion at trial. [See RT at 465–83; 541–59; 564, 618–26; 854–66; 1052–1064.] Ultimately, it was stipulated that a line-up was ordered by the court pre-trial, and that Petitioner was ordered to appear at the lineup as close as possible to his appearance on the day of his arrest. [RT at 564, 566.] Photographs of Petitioner taken on October 30, 1997 (the day after his arrest), on December 23, 1997 (the scheduled date of the line-up) and on January 6, 1998 (the date the line-up actually took place) were admitted at trial. The latter photographs depicted differences in the length of Petitioner's hair and mustache. [RT at 545–47, 553–54.] Foss testified that he refused to go forward with the line-up on December 23, 1997, because Petitioner had not complied with the terms of the court order; his hair—head cleanly shaven at the time of arrest—had grown out, and his mustache was fuller. [RT at 569–71.] Foss further testified that he "permitted" the lineup to go forward on January 6, 1998, at which time Zuniga identified Petitioner as the driver. Foss noted that the only difference between Petitioner's appearance on that date and at arrest was that Petitioner's mustache had been "slightly shaven." [RT at 572.] Clifford Nichols, Petitioner's counsel at the time of the line-up, testified that he did not receive a copy of the booking photograph during discovery, and that when he appeared for the line-up on December 23, 1997, he expected that everything would be ready for the line-up to proceed. Nichols' request that Petitioner be taken back and his hair shaved was refused and the lineup was postponed. The line-up took place about three weeks later; Nichols took no interim action to insure that the lineup would then proceed. [RT at 1067–69.]

Michael ran from the scene and through a gate onto Ruthron Street, a cul-de-sac bordering J–8. Petitioner had driven into the cul-de-sac, and was attempting to turn around. After hearing gunshots, Dena Chitty and Fred Roper—each of whom resided on Ruthron—saw an individual run to the car and get into the passenger side, after which the car drove off. Roper noted the license plate number on Petitioner's car, and provided it to an officer who responded to the scene. [RT 121, 161–64, 203–07, 209–10.]

Officers tracked the license plate number provided by Roper to Petitioner's mother, Graciela Moreno's, residence in Palmdale. Petitioner was not present when the officers arrived. Ms. Moreno consented to a search of the residence, during which officers recovered several "gang related" items from Petitioner's bedroom.[9] A car with the same license plate number noted by Mr. Roper was found in the garage of the house and impounded. [RT at 384–86; 418–29, 431–33.] According to Ms. Moreno, Petitioner and Michael (who resided elsewhere) arrived at the house late that afternoon, and left about two hours later in her car. [RT at 536–37.] Petitioner was arrested later that night. At the time of his arrest, Petitioner had the letter's "TST" (an abbreviation for "Temple Street") tattooed on his forearm, and the words "Temple Street" and "Whisper"—Petitioner's gang moniker—tattooed on his back. Petitioner was wearing large, baggy clothing typical of gang attire, a necklace with the letter "W" on it, and a black belt with the letters "WS" (an abbreviation for "Westside Temple Street") on the buckle. [RT at 407–08, 430, 432, 568.]

Jose Reyes ("Reyes"), a purportedly former BLC gang member, surfaced mid-trial as a prosecution witness.[10] Reyes testified that on October 18, 1997 (eleven days before the Zuniga shooting), he and other BLC members attended a party at which Petitioner, Michael, and other Temple Street gang-members were present and at which a fight broke out between members of the two gangs. [RT at 318–28, 336–38, 341–48.] According to Reyes, there were no problems or any rivalry between the two gangs before that party. [RT at 319, 328, 375.]

Reyes testified that after leaving the party, he and other BLC members were shot at while congregating at a park. [RT at 348–58.] Reyes identified Petitioner as

---

9. As discussed below, the items seized from Petitioner's bedroom included a banner with the words "Westside Temple Street;" a piece of wood with the word "Whisper" on it; and two belt buckles with the letter's "T" and "WS" on them. Officers also observed, and took photographs of, certain markings ("WTS," "Brown Pride," "Mi Vida Loca," and "Whisper") made on a wall in the bedroom. [RT at 420–27; 430–31.] Foss opined that such markings and items were indicative of Petitioner's current and active membership with the Temple Street gang. [RT at 409–13, 435–38.] Petitioner and defense witness Clayton Hollopeter, the Executive Director of the Boys and Girls Club, offered contrary testimony. For example, Hollopeter, who qualified as a gang expert, opined that much of the writings depicted in Petitioner's bedroom appeared to be "bomb-style graffiti," a form of tagging, rather than indicia of "gang-banging." [RT at 881–83, 999–1003, 1010.]

10. Petitioner's trial began on April 28, 1998. As discussed more fully below, on May 7, 1998, the prosecutor informed the court that Reyes had contacted Foss the day before, May 6, reportedly to request that his name be removed from the sheriff's gang file. During their discussion, Reyes volunteered to Foss that he and other BLC gang members were shot at in a park on October 18, 1997, and that Petitioner was the shooter. [RT at 225.] After a hearing [RT 227–91], the trial court ruled that the prosecution could call Reyes, characterizing the October 18th park shooting as a "signature offense." [RT at 226, 292–99.] Reyes testified the next trial day. [RT at 316–77.]

the shooter. Reyes testified that he thought the firearm Petitioner used was "at least a .22," that Petitioner was with his brother at the time, and that the shooting occurred on the heels of a verbal exchange between Reyes and his companions and Petitioner and his companions of their respective gang affiliations. [RT at 357–61.] Reyes further testified that after the shooting, he quit "gang banging," that he no longer associated with BLC members, and that he contacted Foss because he wanted his name out of the sheriff's gang files. [RT at 317–18, 333, 366.] Reyes denied that he was made any promises for his testimony and asserted that he told the truth about the October 18th park shooting incident. [RT at 333–34, 365, 377.]

Reyes admitted at trial that he was then on juvenile probation for possession of a dangerous weapon, that he told Foss that he was trying to get his nephew Michael Reyes, aka "Delinquent" (hereafter "Delinquent") [11]—who was then in custody—out of the BLC gang, and that he was loyal to (i.e. would "back up") all BLC members—including the victim—while he was active in the gang. [RT at 332–34, 370–73.] Reyes explained that it was important for him to contact Foss because someone else was using his gang moniker (name), and he did not want to be blamed for someone else's conduct. He admitted, however, that he waited several months after he purportedly became "inactive" in BLC before contacting Foss, and that he had known that another person had been using his moniker "behind his back" for at least two years. [RT at 367–69.]

Foss testified as the prosecution's gang expert, that in his opinion, Petitioner was an active member of Temple Street,[12] that

11. As discussed more fully below, "Delinquent" was located and interviewed by the defense investigator during the trial. During that interview, Delinquent admitted that he was present at the party with Jose Reyes and the other BLC members as well as at the park at the time of the shooting. Among other things, Delinquent told the defense investigator that "no one from BLC could identify the shooter(s) because they were so far away when they were shooting at us[;]" that they had their suspicions, "but we weren't able to recognize the guys who shot at us." [Pet. Ex. J; MER No. 4.] He further stated that Jose Reyes "lies all the time" and was still involved in BLC. [Id.] Petitioner was unable to elicit this evidence at trial. On the advice of counsel, Delinquent, who was then subject to a pending petition in juvenile court, asserted and was permitted to exercise his Fifth Amendment privilege not to testify. [RT at 732–36.]

12. In addition to Petitioner's tattoos, attire when arrested and the items recovered from his bedroom, Foss testified that he relied on the following in forming his opinion that Petitioner was an active member in the Temple Street gang: information Foss received from LAPD CRASH officers regarding Petitioner [408–09]; a photograph depicting Petitioner, his brother and two other Temple Street members wearing gang attire and flashing gang signs, with gang names and writings on the back and a handwritten roster of Temple Street members with "Whisper" at the top, given to Foss by the mother of Petitioner's then girlfriend [RT at 409–12, 439–42, 613–14]; and the fact that Foss had seen Petitioner's gang name written in graffiti in the City of Lancaster [RT at 442]. Foss also relied upon the fact that, while in county jail awaiting trial, Petitioner was found in possession of a so-called "hard candy"—i.e. "hit"—list which Foss opined was put out by the Mexican Mafia. Foss testified that it was unlikely a non-gang member would be in possession of such a list, and that a person in possession of it would either a messenger or a soldier of the Mexican Mafia. [RT at 451–56.] According to LASO Deputy Kruzner, the "hard candy list" (a small piece of yellow paper, approximately 2x8 inches) was found hidden in the binding of a small, county issued bible (about 3x5 inches) in Petitioner's possession during a routine search after a court appearance. [RT at 500–03.] On cross-examination, Deputy Kruzner demonstrated how he found the paper, admitting that it would not have been visible to someone simply turning the pages of the book. He also testified that he had no information as to the origins of the list or its age, and that it was possible—given the manner in which the paper was secreted—that a person in possession of the book, i.e. Petition-

a rivalry existed between Temple Street [13] and BLC,[14] and that the shooting of Zuniga was gang-related and "payback" for the incident described by Reyes.[15]

Foss admitted that Reyes was the only person who claimed to have witnessed Petitioner commit the shooting at the park; that he had not attempted to verify Reyes' account; and that although he had had several contacts with Reyes in the preceding months (before and after the charged offenses), the first time Reyes said anything to him about the park shooting was on May 6, 1998 (midtrial). [RT at 756–57.] Foss testified that before Reyes contacted him he had received information from three or four other BLC gang members or informants about an "incident" and that there were "problems" involving Temple

Street members that generally corroborated Reyes' account [RT at 442, 444, 593, 772.] However, Foss admitted that these "disclosures" were general, he did not document them, and he could not recall who he had spoken to. [RT at 578, 593–95.] Foss later testified that he had noted information received from at least one person, perhaps two, other than Reyes who identified Petitioner as the shooter, but that the person he was referring to was not a witness to the shooting, and that the information was "second hand."[16] He believed this conversation occurred mid to late October, but his notes were not dated. [RT at 761–62, 769.] Foss also admitted that he also had numerous contacts with Delinquent in the months before and after the charged offenses. [RT at 589–90, 757, 759–61.][17] Foss further admitted that

er, may not have known of its presence. [RT at 504–07.]

**13.** Foss testified that Temple Street gang members are involved in and "commit a wide range of crimes" including murder, assaults and "drive-bys." [RT at 457.] Foss stated that his knowledge and opinion of the activities of Temple Street members was based on "several contacts with Rampart CRASH detectives." Foss testified: "I have spoken ongoingly with Detective Martin. He's their expert on Temple Street. I have talked with other of their CRASH detectives there, and was given information regarding the activities of Temple Street." [RT at 458.]

**14.** With respect to the purported rivalry, Foss testified that his opinion was based on unspecified information he received from BLC members and confidential informants, and particularly, the accusations made by Jose Reyes regarding the party and park shooting [RT 442, 444], as well as "cross-out" graffiti—Temple Street graffiti written or crossed over by BLC graffiti—on the inside walls of an abandoned residence. Foss took three photographs midtrial—admitted at trial and referred herein as People's 20, 21 and 22—which he testified depicted cross-out graffiti at this location that pre-dated the Zuniga shooting. [See RT at 575–79.] Whether or not the prosecution knowingly presented false evidence regarding the cross-out graffiti—i.e., whether or not Foss testified truthfully about

it—is at issue in this petition and addressed below.

**15.** Foss opined that the attack on Zuniga was "payback" and in retaliation for the fight and shooting described by Reyes, and that it was for the benefit of Temple Street based on the circumstances of the attack itself, the fact that the shooter (Michael Blumberg) was himself an active Temple Street member. [RT at 458–64.]

**16.** Foss testified that the persons he talked to were not present when the park shooting occurred and he did not know where or from whom they got their information. [RT at 769, 775.] The prosecutor's objection to defense counsel's follow-up question that, for all Foss knew, the information came from Reyes, was sustained as calling for speculation. [RT at 775.]

**17.** During the evidentiary hearing, Foss revealed that he too had interviewed Delinquent, and that Delinquent confirmed that he was present at the park shooting. Among other things, Delinquent told Foss that it was too dark to identify the shooter. [Evidentiary Hearing Transcript ("EHT") at 60.] As discussed below, Foss deftly avoided acknowledging that he had information from a percipient witness which cast doubt on the reliability of Jose Reyes' identification of Pe-

none of the field interview cards [18] generated by local deputy sheriffs documenting "stops" of Petitioner indicated that he was in the company of known Temple Street

titioner as the park shooter. This is evident is several exchanges during Foss' cross-examination:

Q. Have you taken steps to verify with any other person who has claimed to have been at the scene the truth or untruth of what Jose Reyes said regarding the truck shooting incident?

A. Since—since this trial?

Q. Well, since he first came to you. A. No.
...

Q. Do you know the identify of any of the other people who were supposed to be at the truck on the night of the shooting?

A. As far as monikers, I am familiar with numerous monikers of BLC. The problem is that I can't—I would have to explain how we go out and we contact BLC in particular.

Q. Well—

A. They are notorious for not giving us monikers that aren't their true identities. It is very common with BLC to do this.
[RT at 759–60.]

Foss testified that he received the "disclosure" that Petitioner was the shooter at the park in the middle to end of October. He admitted the "disclosure" was given to him by someone who was not a witness, and that the information was second hand. Foss was then asked:

Q. Did anybody make any disclosures to you other than Mr. Reyes saying "I was there and I saw it"?

A. No.
[RT at 761–62.]

During re-direct examination, Foss explained why he had not initiated a police investigation on the park shooting before the spoke to Jose Reyes:

Q. Is there a reason, at least up until your conversations with Jose Reyes, that you didn't write a [report]?

A. Yes.

Q. Why is that?

A Persons I talked to were not principal witnesses, meaning that they were not physically present when this incident occurred.... In this particular case, I did not locate the victim, and I didn't have a principal witness. So I did not write a first report.

gang members, other than his brother. [RT at 612.]

2. *Defense case*

Clayton Hollopeter,[19] testified for the

[RT at 769.]

Foss continued that since speaking to Jose Reyes, he had written a report and that the park shooting was under investigation. [RT at 771.] Foss further testified that the information he received prior to talking to Jose Reyes was consistent with the information that Jose Reyes gave him. [*Id.*] He admitted that he did not know from whom his prior source—who had not witnessed the shooting—got information about it. [RT at 775.]

18. Foss testified at trial that "field identification" (gang) cards are created and maintained to keep track of and record the activities and contacts of known gang members and their associates. [RT at 401–05; *see also* EHT at 23–24 (explaining that a field identification card is a form used to identify and document information about a gang member, including the basis for the gang identification—i.e., admission, dress, association with known gang members—as well as name, moniker, birthdate, vehicle information, statements made regarding gang status, i.e., when "jumped in." The date and time the record is created is noted; all of the information noted is inputted into a computer base and maintained as an official police record).]

19. At the time of his testimony, Hollopeter was the Executive Director of the Boys and Girls Club of San Gabriel Valley, a longstanding appointed member of the Los Angeles County Juvenile Justice Commission, and the administrator of "Project Return," a county wide program assisting minors returning to the community after release from custody. Hollopeter testified to extensive knowledge of gangs and experience with gang members in Los Angeles County, and in the San Gabriel Valley particularly. [RT at 821–49, 869–79; 889–94, 899–902.] Although familiar with the Temple Street gang historically and presently in Los Angeles—including that it does not have a reputation for violence commensurate with other notoriously violent Hispanic gangs—Hollopeter admitted that he was not familiar with Temple Street's activities in the Antelope Valley, with BLC, or any rivalry Temple Street may have in the Antelope Val-

defense as an expert in gang identification, culture, practices and intervention in Los Angeles County. [*See, e.g.*, RT at 820–52; 869–910; 1009–1011.] Hollopeter opined that the graffiti depicted in Petitioner's bedroom was not gang related, but a form of tagging called "bombing"—i.e., graffiti that is multi-colored and includes cartoon figures; in comparison, the graffiti photographed by Foss in the abandoned house was gang-related. [RT at 881–86.] Hollopeter testified that the roster of names found in Petitioner's room was probably written by a gang member, and could represent everyone known to the writer or who the writer had heard of who was or had been in the gang; admittedly helpful information to law enforcement. [RT at 887–89.] Hollopeter testified that he knew two of the individuals named on the "hard candy list;" both of whom had left "gang life" years before. This suggested to him that the list was not contemporary. [RT at 860–61.]

Juanita Reyes, Jose Reyes' sister-in-law and Delinquent's mother, testified that Reyes' reputation within the family for truth and honesty is "not real good" and that "he lies a lot." [RT at 1157.]

Sarah La Face, at whose house the party (preceding the park shooting incident) was held, contradicted much of Jose Reyes' testimony regarding Petitioner's presence and conduct at the party, as well as the conduct of other attendees. [RT at 1168–74, 1180–88, 1191–92.] [20] Petitioner's mother, Ms. Moreno, [21] and Petitioner's father, Arthur Blumberg, testified that Petitioner's criminal record consisted only of one arrest while in Michael's company, two years prior in 1995, for which Michael, but not Petitioner, served a term in juvenile custody. [RT at 1250, 1269–70, 1320.] [22]

Petitioner testified in his own defense. Michael arrived at Petitioner's house in Palmdale at about 1:00 p.m. They left sometime later—with Petitioner driving—and drove to Lancaster. After stopping at Antelope Valley College, Petitioner drove and turned onto J–8, heading east, toward 32nd Street East and Lancaster School, hoping to see a couple of girls he knew. [RT at 1334–37.] Zuniga was walking down the street. Michael thought he recognized Zuniga, and asked Petitioner to slow down. Michael said to Zuniga: "what's up now, punk? Do you remember me?" Zuniga replied "No, I don't know you." Michael then said "this is Temple Street. Do you got shit?" Zuniga responded "I never heard of you." Michael stated: "that's what I thought. You are

---

ley. [RT at 841, 848, 879.] Hollopeter opined that Petitioner's conduct with respect to Zuniga was not necessarily consistent with committing a gang-related offense. [RT at 906, 909.]

20. For example, Ms. La Face testified that she was standing with Petitioner, his brother and others, and that she never saw them passing any object between each other, nor did she see anyone flashing gang signs or "mad-dogging" any one else. [RT at 1169–71.]

21. Ms. Moreno, testified on cross-examination that she was unaware that Petitioner was a gang member. She also stated that she did not know, before Petitioner's arrest, that he had tattoos. She testified that his clothing covered them, and that she had not seen him

shirtless since he entered his teens. [RT at 1266–73.] During his direct examination, Petitioner testified that wore long sleeved T-shirts to hide his tattoos from his mom, and that he chose the location of his tattoos with the intent of hiding them from her. [RT at 1368.] To demonstrate this, Petitioner donned a T-shirt marked as a defense exhibit for the jury to view. [RT at 1377.]

22. In response to this testimony, the prosecutor signaled that then Los Angeles Police Officer Brian Hewitt would be called as a rebuttal witness to testify as to the circumstances of Petitioner's arrest. Hewitt did so testify. As discussed below, Respondent has since conceded that Hewitt falsely testified about the arrest. The materiality of that false testimony is at issue in this petition.

nothing but a bitch." Zuniga said "All right. I'll remember that." Michael then got mad, saying "what, what?" Petitioner did not say anything to Zuniga. [RT at 1337–39.]

Two cars behind Petitioner started honking, so he made a quick right hand turn onto the first street, 30th Street. He turned around, drove back to and turned onto J–8, continuing on J–8 as before toward the school. Zuniga was still walking down the street. As Petitioner drove past Zuniga, his brother insisted that he stop the car, without saying why. Petitioner refused, told his brother to "forget it" and kept driving. As Petitioner stopped to make a right turn at 32nd Street, Michael started to get out of the car. Michael saw Zuniga walking near a gate leading to another street. Michael told Petitioner to meet him on that street, stating "don't leave me." Michael got out of the car and ran toward Zuniga. Petitioner thought that there would be a confrontation, maybe a fight, but did not plan or discuss that with Michael. He did not see a gun or know that Michael was armed. [RT at 1339–43, 1353.]

Petitioner went looking for Michael because he did not want to leave him. He turned right onto Ruthron, and attempted a quick turn around when he heard gunshots. He did not know who was shooting at whom. As he was turning around, Michael ran up and got into the car, saying "get out of here. Let's get out of here." Petitioner drove away. Petitioner asked what happened, and Michael said he shot the guy.[23] [RT at 1344, 1348–50.] Petitioner drove to their father's house, where they stayed a couple of hours before driving to Petitioner's mother's house. Petitioner parked his car. Sometime later he and Michael left in Petitioner's mother's car. At Michael's request, Petitioner drove to and dropped Michael off at a bus stop in Lancaster. That was the last time Petitioner saw Michael. [RT at 1350–52.] Petitioner returned to his mother's house after learning from her that the police were there, and was arrested. [RT at 1364–65.]

Petitioner was "jumped into" the Temple Street gang in 1994, and got his tattoos that year and in 1995. Michael is also a member, but had different friends. [RT at 1353–55.] Petitioner "hung out" with the gang in Los Angeles until mid–1995. After a friend was killed in a drive-by shooting and because the neighborhood became too dangerous, Petitioner moved away. [RT at 1356–57.] Petitioner testified that he was still a member of Temple Street because he had not been "jumped out."[24] Being "jumped out" is dangerous, so he moved away rather than risk getting hurt.

23. The trial court struck as hearsay Petitioner's testimony that Michael told him he shot Zuniga because he thought Zuniga was going to shoot him first. [RT at 1350.]

24. On cross-examination, Petitioner stated that he was not then a member of Temple Street, and that he got out of the gang sometime in 1995. He denied that he was "claiming" Temple Street at the time of the party at La Face's house. Petitioner explained that "claiming" means letting people know you are from a particular gang. Petitioner stated that he does not "claim" Temple Street or "bang" any more. "Banging" means acting or running with a gang. [RT at 1390–91, 1397.] Petitioner testified that the picture of him, his brother and two friends—depicting him throwing gang signs—was taken after he stopped "banging" and that he was "not claiming at the moment ... it's done more as of memory, really, with old friends." [RT at 1398–1400.] Petitioner stated that the car depicted in the photograph was his, and that he thought that he got the car in early 1997, maybe late 1996. [RT at 1397.] Petitioner stated that he did not take the photograph in 1996; that he did not really recall taking it, and that his testimony on direct that the photograph was taken about a year and a half before the shooting was mistaken. [RT at 1415.]

Petitioner denied being active in "gang-banging" activities and that the items discussed by Foss represented otherwise.[25] Petitioner stated that he "wrapped up" high school and was taking college classes when he was arrested.[26] [RT at 1357–63.] Petitioner denied that he deliberately attempted to alter his appearance for the line-up.[27] He admitted that he lied to police officers after his arrest—telling them he wasn't there—because he knew his brother was in trouble and because his father had made his life difficult in the past when he had not protected Michael.[28] Petitioner admitted that he helped his

25. Addressing the gang paraphernalia discussed by Foss [See notes 9, 12, *supra*.], Petitioner described the "roster" found in his bedroom as a roll call of people he knew or had heard of, and "doodles" that he wrote after July, 1997 while he was dating Desiree. [RT at 1355–56.] He testified that the photograph obtained by Foss from Desiree's mother was taken about a year and a half before he was arrested, and that the writing on the back was Desiree's. [RT at 1358.] Petitioner admitted that he was responsible for the graffiti-type art depicted in his bedroom, that he had drawn them "throughout the years," that it was not recent and had "pretty much stayed the same for probably six months to a year" before his arrest. [RT at 1359.] Petitioner testified that there was other art on his bedroom walls not depicted in the prosecution's photographs, including one wall with religious art on it, and sets of initials—one corresponding to a graffiti crew; others short for certain phrases—done in the style known as "piecing" (i.e. "bombing."). [RT at 1361–62.] As to the "hard candy list," Petitioner testified he had not seen it and did not know about it before the deputy who found it showed it to him and asked him if it was his. [RT at 1363–64.] On cross-examination, Petitioner explained that the "WS" letters on his belt buckle represented different things to him at different times, i.e., "West Side" as well as "W" for Whisper and "S" for his girlfriend (Suzanne; "Shorty"). [RT at 1401–02.] He admitted that some of the writing on the walls in his room is gang writing, and that the "roster" was prepared sometime in 1997 after he had gotten out of the gang. He also admitted that when he testified on direct that he took steps to move away from the gang, he meant geographically; at the time he was stopped in 1995 in Los Angeles, he lived in Palmdale. [RT at 1412–14.] On re-direct, Petitioner explained that he gave the police his mother's address in Palmdale, which was on his driver's license. He further explained that his efforts to "move away" geographically meant that to change, not be in the area anymore. [RT at 1419.]

26. To counter the impression that Petitioner left gang life for school, the prosecution introduced evidence that Petitioner's academic performance during and after high school, and conduct during high school was less than stellar.

27. Petitioner admitted that his head was shaved when arrested, and after arrest, he let his hair grow. He knew that he was supposed to have his head shaved for the line-up. He explained that hair cuts are not free in county jail and require a paid ticket, and that such services are scheduled; accordingly, he believed that the sheriff's would take care of it before the line-up. The day of the second line-up, he was taken early to the inmate barber shop and that deputies made sure that his head was shaven as depicted in the booking photo. Petitioner admitted that his mustache looked different—one side slightly longer—at the line-up, explaining that there are no mirrors, and inmates rely on their reflection in other surfaces (i.e., the pay phone, which is scratched) to shave, which makes it hard to see. After the line-up, Petitioner allowed his hair to grow out. [RT at 1366–67.] On cross-examination, he admitted he was hoping that Zuniga would not identify him at the line-up. [RT at 1407.]

28. On cross-examination, Petitioner stated that before Michael told him what happened, Petitioner thought Michael might have acted in self-defense. Petitioner did not say this to Foss when he was arrested; he lied when he told the police that he had nothing to do with the shooting, was not there and that he was in Palmdale all day. [RT at 1403, 1406, 1408.] Petitioner stated that he could not and did not tell the truth until after he learned that his parents knew that Michael had committed shooting. He became aware that they knew about two months before the trial. [RT at 1406–07.]

brother get away, but denied that his doing so had anything to do with the gang. [RT at 1369–70, 1410.]

Petitioner admitted that he attended the party at Ms. La Face's house, stating that he was back and forth between the party and his girlfriend, Desiree's house. Petitioner admitted that he was standing in the backyard with Michael and "Droopy," who he had met once or twice before, but denied that the three of them were passing anything back and forth between them. Petitioner did not flash gang signs at anybody, was not involved in or see the fights that broke out, and did not shoot at a truck after the party. He believed that Reyes may have been with a group of people passing by Desiree's house that he was introduced to some time prior, but that he had never had a conversation with Reyes and did not otherwise know him. [RT at 1332–34.]

Petitioner admitted on direct examination that in 1995, he, Michael and another individual were stopped while driving late at night and arrested. Petitioner testified that he did not see a gun in the car. [RT at 1371.] Petitioner testified on cross-examination that he was told after the arrest that firearms were found in the car. Petitioner admitted that at the time he and Michael were both active gang members; Petitioner was giving the third person, who Petitioner did not know, a ride home. Petitioner repeated that he did not see any guns in the car, that he did not know whether he was driving in rival gang territory and that the car did not have any hidden compartment. [RT at 1410–12.] On re-direct, Petitioner explained that he

was the last driver where they were hanging around, and that the individual needed a ride home. [RT at 1418.]

### 3. *Rebuttal*

Los Angeles Police Officer Brad Hewitt ("Hewitt") testified that while assigned to the Rampart CRASH Division in 1995 he arrested Petitioner, Michael and another Temple Street gang member after he observed the three surreptitiously driving (Petitioner at the wheel) late at night in rival gang territory and saw the front passenger pass a handgun to the right rear passenger (Michael). [RT at 1429–32.] Hewitt further testified that he "recovered" two automatic handguns from a hidden compartment in the armrest area of the right rear passenger seat, and that in his expert opinion, Petitioner and his companions were in a rival gang area to commit an assault with a deadly weapon. [RT at 1432–35, 1438.][29] On redirect examination, Hewitt again testified that he saw the individual sitting next to Petitioner pass a gun to the rear passenger. [RT at 1438.][30]

### 4. *Closing Argument*

At the outset of closing argument, the prosecutor stated to the jury that the case was about "three things:"

> It's about knowledge. It's about intent and its about credibility.
>
> . . . .
>
> What did the defendant know and when did he know it?

**29.** Hewitt testified that when he later attempted to show the "false compartment" to the juvenile court judge presiding over the case subsequently filed against Petitioner's brother and passenger, the molding on the side of the car "had been completely replaced" and that Petitioner's father had custody and control of the car at the time. [RT at 1435–36.]

**30.** Foss also testified on rebuttal, disputing Mr. Hollopeter's opinion that the graffiti in Petitioner's room was "bombing" rather than gang-related, as well as Hollopeter's testimony that the Mexican Mafia acts against inmates, rather than people outside of prisons. [RT at 1440–43.]

Intent. What did the defendant intend that day, and what did his brother intend?

And, finally, credibility .... [¶] ... whether Detective Foss was telling the truth .... whether Officer Hewitt from L.A.P.D. was telling the truth .... and whether or not [Petitioner] was telling the truth[.]"

[RT at 1460.] Turning first to the charged conspiracy to commit murder, the prosecutor argued that the offense required proof of an agreement to commit murder, and specific intent by each person to kill unlawfully. The prosecutor noted the lack of evidence of an express agreement, stating:

"But you have heard evidence of other acts by this defendant. Your have heard evidence of other acts by this defendant and his particular brother. That is evidence, ladies and gentlemen, of what his intent was on that particular day.

[RT at 1461.] The prosecutor continued that the unlawful agreement could be inferred from the circumstantial evidence, i.e., Petitioner and his brother's conduct [RT at 1461]; then stated:

"Let's talk about another way. Evidence of other crimes.

The other crimes are:

The defendant, 11 days earlier ... when he was the shooter. That is the other crime in this case....

What, about three years ago, when this defendant was the driver in a vehicle in which other Temple Street gang members were there, and they had guns....

But evidence of crimes, ladies and gentlemen, will get you to the agreement and the intent that this defendant shared with his brother that day.

. . .

Evidence of other crimes ... may ... show that there was a method, plan or scheme. Evidence of other crimes can

be used to show the intent. What ware we talking about? An agreement and intent.

Evidence of other crimes can be used to show motive. The reason they wanted to kill Ramon Zuniga that day. They were having a fight with BLC. Ramon Zuniga is a BLC member. They want to kill him. That's what evidence of other crimes will get you to.

Evidence of other crimes ... can be used to show knowledge.

And ... evidence of other crimes can be used to show the existence of a conspiracy.

So those are the two ways that we get to the agreement and to the intent.

[RT 1465–66.] Continuing, the prosecutor repeated that inferences raised by Petitioner's actions were sufficient to establish the requisite agreement and intent [RT at 1467–68], but that the jury could reach the same conclusion based on the other acts evidence:

This defendant is a shooter, eleven days earlier, against rival BLC gang members. This defendant was, not his brother. His brother's turn was eleven days later. But on October 18th, after the confrontation at the birthday party, it was his time.

. . . .

Shooter, eleven days earlier. The same gang was involved. The same rival gang, BLC. The same weapon, or the same type of weapon was possibly involved.

You heard Jose Reyes. He's the one who testified about that particular incident.

. . . .

But Jose Reyes told you something to the effect, it was a small caliber weapon. I believe he said like a .22 or .25. And we know that the gun that Ramon Zuni-

ga was shot with was a .22 caliber. So evidence of other crimes.... The same gang, same rival gang, same weapon, same M.O.

.... M.O. is modis operandi. How this defendant does things. How this defendant and his brother do things. How members of Temple Street do things. Same M.O. eleven days earlier. The only difference being this defendant was the shooter. It was his turn that day, and there was another driver. Because his brother got out of the car with him.

That's how you get to agreement and intent. That's how you get to what is going on in this defendant's mind when he was driving that car on October 29, 1997.

. . .

Is this the only way to get to the agreement and intent? Not at all. The defendant was previously arrested under similar circumstances.

. . .

... He didn't shoot anybody in that case. He didn't have a chance to.

. . .

What we know is this defendant, once again, had control of a vehicle. Different car that night. They were in rival gang territory. That's what Officer Hewitt told you. They had guns in the car. Not one gun, but two guns. The defendant was with his brother, a Temple Street gang member, and was with another Temple Street gang member, and on that particular night a gang war was going on.

Does that sound familiar? Maybe if Detective Foss had been riding around on October 29, 1997, had a reason to stop the defendant. We would almost have the exact scenario and he wouldn't have had a chance to shoot anybody that day.

You heard what Officer Hewitt said.... His [expert] opinion was that that night ... they were in that area to commit an assault with a deadly weapon on a rival gang member.

. . . .

... Three ways to get to intent and agreement.

[RT at 1469–71.] The prosecutor emphasized that although the jury had to find that there was an agreement and intent,

... what is important is that all of you don't have to agree on how to get there....

... one of you may say, 'I think because of the previous incident in 1995' ... they were there to kill Ramon Zuniga.... Two of you can agree that, 'well, based on what happened in April '95, that its clear to me beyond a reasonable doubt that this defendant had the intent that day, or shared that intent that his brother had to kill Ramon Zuniga. It's clear to me that this defendant had an agreement with his brother that this is what we are going to do. This is where I'll pick you up.' One or two of you can agree that, 'for me, it's April of 95. All right. You know, three or four others of you, or six or seven, may say 'well, you know, for me, its that previous incident eleven days earlier, you know, where he was the shooter, where he was out trying to kill members of BLC himself personally.'

So, it doesn't matter how you get to agreement and intent. You have three ways to get there, and you don't all have to agree.

[RT at 1471–72.]

Turning to the credibility of the witnesses, the prosecutor argued that Zuniga was credible and had no reason to lie, urging the jury to look beyond discrepancies between Zuniga's testimony and prior statements he made to the police contem-

poraneous to the shooting, his gang affiliation, and any bias he had against Petitioner. [RT at 1473–75.][31] As to Jose Reyes, "the witness who puts this defendant as the shooter at that previous incident eleven days earlier," the prosecutor similarly argued that Reyes had "no reason to lie." [RT at 1475–76]; that "there has been nothing showing that he had a reason to lie. That he had a motive. That he had a bias.... [¶] Jose Reyes is or was a gang member. Was a gang member. I think is probably more accurate. That is what his testimony was." [RT at 1477.] The prosecutor contended that the fact that Reyes was considered to be dishonest by family members was hardly surprising in context, and that there was no evidence that Reyes received anything in exchange for his testimony. [RT at 1476–78.]

The prosecutor argued that to find Petitioner not guilty as charged, the jury would have to believe not only that Zuniga and Reyes lied, but that the law enforcement witnesses did as well:

"You have to find that Detective Foss lied or was mistaken about a number of facts in this case. About a list of facts too long to list about this defendant being a gang member ... that with his years of training and experience, Detective Foss was wrong about that or came in here and intentionally lied to you about those things. You've got to find that Officer Hewitt drove 80 miles from Los Angeles to come here and lie to you. Or to be mistaken. All the tax dollars we pay Detective Foss and Officer Hewitt.

[RT at 1479–80.]

After discounting the defense witnesses (with the notable exception of a deputy sheriff) as either unbelievable or biased [RT at 1482–85], the prosecutor turned to Petitioner, arguing that although Petitioner admitted that he lied to the police, he then lied to the jury as to his reasons for doing so. [RT at 1486–89.] The prosecutor further argued that Petitioner lied about the contents of the photograph depicting him throwing gang signs; that it could be inferred from the evidence that Petitioner purposefully failed to ready himself for the line-up; that Petitioner changed his story after doing some research and after Zuniga identified him at the line-up; and that the defense's efforts to depict Petitioner as a student who had turned his life around—along with his appearance and demeanor at trial—was orchestrated to avoid conviction other than as an accessory after the fact. [RT at 1490–94.]

The prosecutor then argued:

The defendant, ladies and gentlemen, lied to you about the previous incident in this case. I am not going to go back over what Jose Reyes said, except to say that one of the things that [Deputy] Foss testified to you about, he didn't say who did the shooting. I don't know if he knows. That's not an issue of whether he knows who did the shooting. But he told you when he testified as an expert that he was aware of a shooting that had taken place between Temple Street and BLC. His testimony, [Deputy] Foss' corroborates Jose Reyes.

Jose Reyes comes in and gives a little bit more flavor to that shooting and said,'Yeah, there was a shooting, and this guy, [Petitioner], was the shooter.'

But, more importantly, the defendant lied to you about what took place in Los Angeles in April of '95. He said, you know, 'I was told there was some guns

**31.** The prosecutor argued that Zuniga's testimony was corroborated to some degree by other witnesses, i.e., Rasmussen, who testified that he did not observe Zuniga doing anything other than walking down the street. [RT at 1475.]

in the car. I didn't know. I didn't know.'

What did Officer Hewitt tell you? It was a situation where Officer Hewitt is either lying—he either drove 80 miles from Los Angeles to lie to you, or he's just so off base in his opinion as to really be, you know, I'll say it, worthless as a police officer.

But he said, 'I watched the passenger in a Toyota Tercel,' all right, not a Suburban, not a huge Cadillac, not a big Lincoln Town Car, but a passenger in a Toyota Tercel. We know how big—you know, it's a small, compact car. 'I saw . . . the passenger in the front seat pass a gun from the front seat to the back seat.'

That's what he saw from another police car. I mean, from another car. He could see a gun in the car.

But this defendant will come into this courtroom, ladies and gentlemen, and tell you, 'I was told there was a gun in the car. I didn't know nothing about that, Officer Hewitt.'

There was a hidden compartment in that car. The defendant's car.

[Petitioner] said, ladies and gentlemen, 'I promise you I don't know anything about a hidden compartment being in that car.'

He lied to you, ladies and gentlemen. He lied to you.

The judge will instruct you, ladies and gentlemen, that if the witness is willfully false . . . in one portion or aspect of his testimony, he is to be disbelieved or distrusted in other aspects of his testimony.

[RT at 1495–96.] The prosecutor accordingly urged the jury to "throw it all out" and conclude that Petitioner was lying about everything, to reject any lesser or related offenses, and to find that Petitioner agreed with and shared the same intent as his brother and therefore was guilty of the charged conspiracy and attempted murder. [RT at 1497–98, 1501.] [32]

Defense counsel argued that there was no dispute that Petitioner was guilty of being an accessory after the fact, or that Michael Blumberg committed an assault with a deadly weapon. [RT at 1520–21, 24–26.] Defense counsel argued that Petitioner's liability for the assault and/or attempted murder was dependent on proof that he aided and abetted, or was an accomplice, to Michael Blumberg. Liability on these theories, in turn, required proof that Petitioner knew of his brother's unlawful purpose and intended to assist him in accomplishing it. [RT at 1514–17, 1520–23.] Similarly, the charged conspiracy required proof of an agreement with the specific intent to commit murder. [RT at 1517–20.]

Turning to the evidence, defense counsel agreed that the conversation preceding the

---

**32.** In his concluding remarks, the prosecutor also urged the jury to find true the alleged gang-enhancement, the elements of which include proof of a pattern of criminal activity, that the charged crime was committed for the benefit of the Temple Street gang, and that Petitioner was a member of that gang. As to the first element, the prosecutor cited the park shooting testified to by Jose Reyes, as well as other evidence regarding a purported Temple Street member (not Petitioner or his brother) who was convicted of an assault with a deadly weapon. As to Petitioner's gang membership, the prosecutor highlighted Petitioner's moniker, appearance when arrested, tattoos, the undated photograph depicting him throwing gang signs, and the fact that the "hard candy list" was found in his possession. [RT at 1498–01.] As to the later, the prosecutor argued that Petitioner lied when he testified that he did not know about it and was unaware that it was in the binding of his bible, and repeated that wilful false testimony as to one matter is sufficient grounds to reject all of his testimony. [RT at 1501.]

shooting was key, arguing not that Zuniga lied, but that the inconsistencies in his statements overtime regarding the conversation, as well as less significant details, rendered the reliability of his testimony suspect and insufficient to meet the beyond a reasonable doubt standard. [RT 1527–35.] With respect to the other crimes evidence to show Petitioner's intent and knowledge, defense counsel dismissed Officer Hewitt's testimony regarding Petitioner's 1995 arrest, as it did not result in any charges. [RT at 1535–37.] Defense counsel argued that Jose Reyes' testimony should also be dismissed, noting that the timing of his revelation to Foss about the park shooting was particularly suspect, that Reyes admitted that he wanted to help his cousin Delinquent (who happened to be released from custody within days of Reyes' testimony), that he is loyal to BLC (of which Zuniga is a member), that he was the only person to identify Petitioner as the shooter, that Reyes had a reputation as a liar among his family members, and that Sarah La Face contradicted Reyes's account of Petitioner's conduct at her party. [RT at 1537–42.]

Defense counsel countered that neither the hard candy list—which, counsel argued, at best, supports what had already been admitted, i.e., that Petitioner was a gang member—nor the circumstances surrounding the line-up shed any light on Petitioner's state of mind and knowledge at the time of the offenses. [RT at 1542–48.] [33] Further, defense counsel argued that the evidence of Petitioner's gang membership [34] was not indicative of active criminal gang activity from which the requisite intent could be inferred, and that a contrary inference could be raised based on Petitioner's continuing, albeit imperfect, efforts to continue his education. [RT at 1549–54.] [35] Defense counsel acknowledged that the gang experts—i.e. Foss and Hollopeter—had different credentials and approached the subject of gang membership and activity from different perspectives and urged the jury to make its own conclusions. [RT at 1557.] Defense counsel argued that Petitioner's admission that he lied to Foss was indicative of an admission of wrongdoing and desire to proceed truthfully, that the jury should reject outright the notion that the defense was fabricated, and that Petitioner's explanation why he was scared to tell the truth at first should not be discounted based on speculation as to what and when his parents may have learned about the crime. [RT at 1555–57.]

33. Defense counsel argued that Petitioner's possession of the bible (in which the hard candy list was hidden) was not a ruse but a reflection of his religious proclivities which predated that incident. [RT at 1542–44.] As to the line-up, defense counsel disputed that it was Petitioner's fault that the first line-up did not go forward, characterizing it instead as an "innocent screw-up"—everybody assumed that the sheriff's would take the necessary steps for it to go forward, and that this is exactly what happened—including taking Petitioner to have his head shaved—when the line-up was rescheduled. [RT at 1544–48.]

34. Defense counsel argued that this evidence was offered to inflame the jury (which counsel argues was evidenced by the prosecutor's insistence that Petitioner disrobe to the waist to exhibit his tattoos during his testimony, even though photographs depicting them had been admitted); for the purpose of supplying a motive and explanation for what counsel characterized as otherwise illogical behavior of one purportedly intent on committing a crime; and to satisfy an element of the alleged gang enhancement. [RT at 1549–52.]

35. Counsel argued that field identification cards, the purpose of which, as Foss testified, was to track gang members, their associations and activities, indicated only that Petitioner was stopped in the company of his brother. Counsel continued that Reyes' testimony that Petitioner was an active Temple Street gang member was either uncorroborated (i.e. the park shooting) or was contradicted by La Face (the party). [RT at 1553–54.]

During rebuttal, the prosecutor argued that while Zuniga gave inconsistent statements, he always maintained that both individuals in the car verbally challenged him. [RT at 1563.] The prosecutor discounted Hollopeter's testimony [RT at 1568–70], and reiterated that Petitioner is a liar; otherwise, Foss and Jose Reyes must have perjured themselves. [RT at 1564–68; 1571–72.] Petitioner's 1995 arrest was evidence "at [the prosecution's] disposal" to use to "talk about what was going on in the defendant's mind on [the day of the charged shooting]" and "to prove a case to you." [RT at 1576.] The prosecutor argued that Petitioner lied about that incident, and that Officer Hewitt "drove 80 miles from L.A." to give the jury the "entire picture" in response to Petitioner's testimony; to "talk about what really went on that night." [RT at 1577–78.] The prosecutor chided the defense's claim that Reyes was "backing up" Zuniga or was otherwise biased because of their joint affiliation with BLC, as well as the suggestion that Reyes expected a benefit as a result of his testimony. [RT at 1572, 1578.]

In conclusion, the prosecutor argued that to find Petitioner credible, the jury would have to find that most—if not all—of the prosecution witnesses were not credible, which the prosecutor continued "is not reasonable[:]"

... I submit to you again. This case is about three things. This case is about

knowledge. This case [is] about intent. This case is about credibility. This case is about what this defendant knew and when.

And I submit to you, ladies and gentlemen, based upon all [the] testimony. Based upon all the things that you heard about in '95. Based on what you heard about [the park shooting incident]. That this defendant and his brother shared the same intent that day, October 29, 1997: That they entered into an agreement to kill a rival gang member because that is what gang members do when they are at war; that there were several overt acts committed in furtherance of that conspiracy; and that the end result of that was that this defendant's brother got out of the vehicle that day and shot Ramon Zuniga six times in the chest and stomach area. And that based on that evidence, ladies and gentlemen, this defendant is guilty of conspiracy to commit murder, and that this defendant is guilty of attempted, premeditated, willful and deliberate murder.

[RT at 1582.]

At the end of the first day of jury deliberations, the jury requested a read back of the testimony of both Ramon Zuniga and Jose Reyes. [CT at 145–46.] [36] Deliberations continued two days later after the requested testimony was read back. [CT at 149.]

---

**36.** The record reflects that the request also included a portion of Foss' testimony, but that the jury changed its mind after the readback of Zuniga and Reyes' testimony. [CT at 145; RT at 1661.] The record also includes a second jury note dated June 5 (the second day of deliberations) pertaining to an alleged overt act (relating to the allegation that Petitioner himself said words to Zuniga that could be considered to be a challenge) as well as a question regarding the charged use of the firearm enhancement. [CT at 148.] The clerk's transcript indicates that the note was ordered filed, but neither it nor the reporter's transcript indicates the response made to it. [CT at 148–49, 151.] The clerk's transcript also indicates that on the third day of deliberations, the jury received more read back, but it is not specified as to what. [CT at 151.] The same record indicates that the jury thereafter, submitted a third note asking for clarification of the gang enhancement, which the court answered. [CT at 150; RT at 1662–65.] The next day, the fourth day of deliberations, the jury reached its verdict. [CT at 153; RT at 1703.]

### B. State Court Post Conviction Proceedings [37]

**37.** The record before this court is but a fraction of the materials and pleadings that appear to have been submitted by the parties during state habeas proceedings. The following summary derives principally from Petitioner's habeas petition, and exhibits thereto, filed in the California Supreme Court [Lodg. No. 15] which is the operative petition for purpose of this court's review. However, the last reasoned state court decision regarding most of Petitioner's present claims is that of the California Court of Appeal. In that court, Petitioner filed an initial (pro se) petition and exhibits, and a supplemental petition (by appointed counsel) which incorporated his initial claims and added others. Absent contrary indication, this court has proceeded on the assumption that the petition filed in the California Supreme Court essentially replicates the supplemental petition filed in and rejected by the state appellate court. Petitioner's initial pro se petition and exhibits [Lodg. No. 12], but not the supplemental petition, has been lodged with this court. Where helpful by way of background, or to give context to the state appellate court's decision, this summary also derives from Petitioner's pro per petition filed in the state appellate court. No pleadings or submissions filed by either party in the superior court have been lodged with this court, although—to the extent pertinent—the gist of those materials is reflected in lodged documents. With one minor exception (*see* note 44, *infra*.) the documents lodged with the court reveal no opposition by Respondent to the exhibits relied upon by Petitioner during state collateral review which are described in this summary.

**38.** Petitioner raised five claims on direct appeal [*See* Lodg. 3], none of which are raised in the instant petition. As discussed below, two of those claims are peripherally relevant to the issues raised in the instant petition. In pertinent part, Petitioner argued on direct appeal that Hewitt's opinion—that Petitioner and his companions were in area for the purpose of committing an assault with a deadly weapon—exceeded the bounds of permissible opinion testimony, and that introduction of it violated Petitioner's right to a fair trial and due process. [Lodg. 3 at 37–41(Claim Three).] Citing California law, Petitioner argued that admission of Hewitt's im-

Before conclusion of direct review,[38] Petitioner discovered through media and oth-

proper opinion resulted in a "miscarriage of justice[:]"

.... The prosecutor repeatedly exploited officer Hewitt's 'expert' 'opinion' that [Petitioner] previously was about to commit an assault with a deadly weapon on a rival gang member to prove here [Petitioner's] conspiratorial agreement, aiding and abetting intent, and incredibility."

[*Id.* at 39.] Petitioner further argued that the error was not harmless under federal law. [*Id.*] In addition, Petitioner referenced Hewitt's opinion testimony in support of his fourth claim [alleging cumulative error], contending that "Hewitt's erroneously admitted opinion portrayed [Petitioner] as a knowing coconspirator with and aider and abettor of violent gang criminals" and that "[t]he improper evidence damaged [Petitioner's] credibility." [*Id.* at 40.]

In response, Respondent argued, in pertinent part, that Hewitt's opinion testimony (given on re-direct examination) was properly admitted, and that any error in its admission was harmless, because:

"Officer Hewitt's testimony regarding [Petitioner's] involvement in the 1995 incident was damaging to the defense aside from his opinion. The jury learned [Petitioner] was previously driving his brother through rival gang territory with firearms. The car [Petitioner] was driving in 1995 even had a secret compartment to hide the firearms. Officer Hewitt described a gun being passed from the front of the car to the rear. From this information the jury could reasonably conclude [Petitioner] was lying when he testified that he was unaware his brother had a gun or was going to shoot Zuniga. The jury did not need to hear Officer Hewitt's opinion regarding appellant's purpose in 1995 in order to conclude [Petitioner] was not being truthful when he testified.

[Lodg. 6 at 37–38.] Additionally, Respondent argued that "Officer Hewitt's testimony covered a time when [Petitioner] admitted he was an active Temple Street gang member[;]" "[t]he 1995 incident happened ... before [Petitioner] claims he drifted away from gang life[;]" and therefore, "[Petitioner] cannot show prejudice from Officer Hewitt's opinion, because the opinion concerned a time before [Petitioner] claims to have left active gang life." [*Id.* at 38.] Respondent also argued that based on Reyes testimony regarding the

er sources that Officer Hewitt had been terminated from the LAPD in March, 1999, for excessive force and other charges for which he was under an internal investigation at the time of his testimony at Petitioner's trial. [Lodg. No. 15, Ex. C; Pet., Ex. C.][39] Petitioner's appellate counsel had also heard from a Los Angeles Deputy City Attorney that Hewitt had filed a false declaration regarding alleged criminal gang activity. [Lodg. No. 12, Ex. D, F.] Contemporaneously, LAPD investigators pursing the now infamous "Rampart" police corruption scandal had been informed by fellow CRASH and then con-

victed officer Rafael Perez that Hewitt was "in the loop" and was well known to fabricate probable cause to arrest, plant evidence, and falsify reports. [Lodg. No. 12, Ex. H.]

Petitioner's appellate counsel contacted the Los Angeles County District Attorney's ("DA") office, requesting *Brady* discovery regarding Hewitt and that Petitioner's conviction be reviewed in light of the above developments. [*Id.*, Ex. F.] In apparent response to these inquiries, and after review of the trial transcripts, appellate briefs, and a litany of Hewitt's purported bad acts, Deputy District Attorney

---

park shooting, "the jury could reasonable [sic] conclude [Petitioner] was still and [sic] active gang member who currently carried out crimes of violence against rival gang members and [Petitioner] knew his brother was also an active gang member capable of the same acts of violence." [*Id.*] This, plus the physical evidence of gang membership, and Petitioner's own lack of credibility, rendered any error harmless beyond a reasonable doubt. [*Id.*]

The state appellate court rejected Petitioner's claim, holding that the opinion testimony was properly admitted as a matter of state law, and that any error was harmless "under any reversible error standard." [Lodg. No. 7 at 10–15.] This determination was subsequently incorporated in the state appellate court's decision on collateral review, at issue herein.

39. The record indicates that a felony battery complaint was filed against Hewitt by Ismael Jimenez on February 26, 1998. According to LAPD internal affairs reports, pedestrians Jimenez and his companion, Eduardo Hernandez—both known 18th Street gang members—were by detained Hewitt and his partner ostensibly for investigation of an auto theft, searched, handcuffed and transported to the Rampart station. At the station, Jimenez and Hernandez were placed in different interview rooms, and questioned by Hewitt about a personal complaint filed by Hernandez against another Rampart officer and about a gun. Hernandez was released, after which Hewitt interviewed Jimenez, who was still handcuffed and was seated on a chair.

Hewitt threatened Jimenez that he could book him if not for a stolen car, for something else, and demanded information about a gun. When Jimenez refused to answer, Hewitt grabbed him by the neck, pushing him and causing him to strike his head against the wall. Hewitt punched Jimenez several times in the chest and once on the left side, then left the room. Jimenez felt faint and started sweating, then vomited blood. Some minutes later, he was released and escorted outside by another officer. Jimenez was subsequently taken to the emergency room by friends and treated for his injuries. LAPD investigators found and removed a blood stained section of the carpet in the interview room where Jimenez was assaulted. [Lodg. No. 15, Ex. C; Pet., Ex. C.] Hewitt was officially relieved of duty on August 31, 1998 [Lodg. No. 15, Ex. D; Pet. Ex. D.], several days before Petitioner was sentenced on September 9, 1998. Hewitt was terminated from the LAPD on or about June 18, 1999, after an administrative hearing resulting in a determination that Hewitt improperly detained both Jimenez and Hernandez; searched Hernandez's vehicle without consent or probable cause; grabbed Jimenez by the neck, slammed him against the wall, and struck him in the chest with a closed fist while Jimenez was handcuffed; and that Hewitt improperly removed photographs from Jimenez's vehicle and failed to return or properly account for them. [Lodg. No. 15, Ex. E; Pet., Ex. H.] Additionally, there is indication in the record that the LAPD referred the Jimenez incident to the DA's office on October 13, 1998, for prosecution. [Lodg. No. 12 at 31.]

("DDA") George Rosenstock concluded in a memorandum to his superiors that:

> [I]t appears the credibility of former Officer Hewitt is seriously brought into question by his apparent involvement in a panoply of criminal activities and conspiracies to frame persons utilize excessive force all of which involve moral turpitude. The prior "bad acts" of former Officer Hewitt are discoverable under *Brady v. Maryland.* It appears that if the jury had been aware of this discoverable material that their estimation of the credibility of Hewitt's rebuttal testimony may have been materially and negatively affected. Accordingly, confidence in the integrity of the verdict is severely undermined. I recommend that the Attorney General's Office be informed of our opinion and that a new trial be granted or, alternatively, that a Writ of Habeas Corpus be immediately prepared in support of reversal of the conviction in conjunction with a Motion for a New Trial.

[Lodg. No. 12, Ex. H.] [40]

Although the early indication was that the DA's office would proceed as recommended by Rosenstock,[41] habeas proceedings were not, in fact, initiated on Petitioner's behalf. In the ensuing months, Petitioner, through counsel, pursued and obtained *Brady* materials regarding Hewitt particularly, and the Rampart corruption investigation peripherally. [Lodg. No. 12 at 26–40.] [42] Included in these materials was transcripts of Hewitt's administrative hearing before the LAPD Board of Rights. [*Id.* at 32.] At a hearing on June 1, 1999, Hewitt testified that he was assigned to the Rampart CRASH unit from June 1994 to August 1996, and that he "worked Temple Street" for the first two months, after which—and for the remaining two years—he was assigned to "18th Street." [Lodg. No. 15, Ex. B; Pet., Ex. B.] Transcripts of a subsequent hearing, on June 18, 1999, reflect the Board's findings and decision prescribing Hewitt's termination from the LAPD [Lodg. No. 15, Ex. H, I; Pet., Ex. H, I], as well as reveal a 1993 sustained complaint against Hewitt after he and another officer were caught in a lie and engaged in fabrication to protect themselves, which complaint was supported by a letter written by Hewitt's then commanding officer questioning Hewitt's maturity and truthfulness. [Lodg. No. 15, Ex. E; Pet. at 19, Ex. E.] [43]

**40.** The record reflects that Rosenstock's recommendation was forwarded to the Attorney General's office. [Lodg. 12, Ex. H.]

**41.** The record reveals that in or about early April, 2000, (after the state appellate court affirmed Petitioner's conviction but before review was denied) Petitioner was summoned to appear in Los Angeles Superior Court at the request of the District Attorney's office for the purpose of a hearing on a writ of habeas corpus. [Lodg. 12, Ex. I, J.] Petitioner's trial counsel learned, and informed Petitioner when he appeared on the summons, that the DA's office intended to file a motion to vacate his conviction in light of Hewitt's involvement in the case. Trial counsel was told, and relayed to Petitioner, that the paperwork was not completed but probably would be within the next week. Trial counsel understood that the DA had made its decision and was waiting on final "pro forma" clearances to proceed. Petitioner was summoned back to court a few days later, but did not make an appearance or speak to anyone about his case. He was returned to state prison about a week later. [Lodg. No. 12, Ex. I–L; Lodg. No. 15, Ex. A (Declaration of Paul Blumberg).]

**42.** With minor exception (i.e., selected portions of de-briefing interviews of Rafael Perez, and so-called "Brady" notebooks), the disclosures are described generically in Petitioner's habeas petition in the state appellate court as "incident reports, case packets, investigative reports, memoranda, court transcripts, etc." amounting to "roughly 5,500 pages." [Lodg., No. 12 at 35, 38.]

**43.** Petitioner represents in the instant petition that he has not received discovery about this complaint. [Pet. at 19, n. 4.]

Incorporating information gleamed from the materials disclosed by the state, as well as information Petitioner independently garnered from his independent investigation (including records filed in other courts regarding other convictions subject to review in the wake of Perez's revelations), Petitioner commenced habeas relief in the state courts seeking to overturn his conviction, in pertinent part, on the grounds that the state withheld material exculpatory and impeachment evidence in violation of *Brady*, that false evidence was introduced at Petitioner's trial by Hewitt, Reyes and Foss; and that newly discovered evidence undermined the prosecution's case and pointed to Petitioner's innocence. [Lodg. No. 12 at 56; Lodg. No. 15 at 3.]

With respect to Hewitt, Petitioner tracked specific instances of misconduct by Hewitt while assigned to the Rampart division and CRASH—most predating Hewitt's testimony at Petitioner's trial and occurring before Hewitt was relieved of duty just days before Petitioner's sentencing—evidencing Hewitt's propensity for planting evidence and committing perjury.[44] Petitioner chronicled convictions over-turned to date as a result of that misconduct. [Lodg. No. 12 at 26–36; Lodg. No. 15 at 4.] Petitioner documented similar acts of misconduct contemporaneously committed by other CRASH officers, particularly Lawrence Martinez, Hewitt's partner at the time of Petitioner's 1995 arrest and Sam Martin, the Temple Street "gang expert" with whom Foss consulted before Petitioner's trial, both of whom emerged as active participants in the corruption scandal. [Lodg. No. 12 at 13, 20, 27 n. 15, 30, 34, 39–50.][45]

In addition, Petitioner learned while preparing his traverse in the superior court that in 1997—before Perez's revelations about police corruption at the Rampart Division—then Deputy District Attorney Steve Giedzinski reported to his supervisor his belief that a police report in a case he was then prosecuting falsely reported that four witnesses identified the defendant at a field show-up after being admonished of field show-up procedures. [Lodg. No. 12 at 58–59.] The report, written by Hewitt's then partner, Baskett, identifies Hewitt as present at the scene

44. In a footnote in the return filed in the superior court, Respondent expressed no opposition to the court's taking judicial notice of the existence or contents of the Perez transcripts and so-called "Brady books" on Hewitt and Perez for the non-hearsay purpose of establishing when the evidence relevant to Hewitt's credibility became known, however, Respondent did object on hearsay grounds to the extent that materials were offered for the truth of the allegations asserted. [Lodg. No. 15, Ex. F; Pet., Ex. F.]

45. Petitioner unsuccessfully sought *Brady* discovery in the Superior Court regarding Rampart CRASH "Temple Street gang experts," particularly Martinez and Martin [Lodg. No. 12 at 39–40, 44–48.] Petitioner proffered that Foss relied upon by information received from these CRASH officers in formulating his "gang expert" opinions, that the information Foss relied upon presumptively "is tainted and false," and that "in light of these facts, Foss testified falsely at [Petitioner's] trial." Petitioner asserted that "since Foss relied upon tainted information from these miscreant officers in formulating his 'gang-expert' opinions, [P]etitioner is entitled to the Rampart CRASH 'Temple Street gang-expert' misconduct evidence . . . [which constitutes] impeachment evidence . . . he would have utilized . . . in effectively cross-examining Foss." [*Id.* at 50–51.] The superior court ultimately rejected this claim, noting that the instances of alleged misconduct by Martin and Martinez occurred in other cases, that neither testified at Petitioner's trial, and that nothing in the record indicated that Foss spoke to Martinez, and that Petitioner had not alleged that Foss knowingly testified falsely. The court further concluded that *Brady* was inapplicable as to a non-testifying witness, and that there was no indication that the prosecution knew of Martin's misconduct and failed to disclose it. [Lodg. No. 11 at 4–6.]

and states that Perez and another officer, Mora, conducted the field show up after providing the requisite admonition. Hewitt executed a declaration of probable cause to arrest the defendant, incorporating Baskett's report, and expressly stating that "we conducted a field show-up" at which the four witnesses "all positively identified" the defendant. [Lodg. No. 12, Ex. UU; Lodg. No. 15, Ex. G; Pet., Ex. G.]

In support of his claim that Jose Reyes falsely testified at trial—particularly with respect to his identification of Petitioner as the park shooter and his testimony that he was no longer a gang member—Petitioner submitted Delinquent's signed statement obtained by the defense investigator which evidence Petitioner was unable to present at trial.[46] [Lodg. No. 15, Ex. J; Pet. Ex. J; MER No. 4.][47]

In addition, Petitioner submitted a report prepared by the defense investigator regarding a follow-up visit to Delinquent, at which time Delinquent's mother, Juanita Reyes, spontaneously stated (among other things), that Jose Reyes told her that he testified at Petitioner's trial to help and stand up for Zuniga because no one from else from BLC wanted to. [Lodg. No. 15, Ex. K; Pet. Ex. K.] Petitioner also submitted a copy of a sheriff's gang field identification card dated November 26, 1997, made out in the name of Jose Narciso Reyes, with a date of birth August 13,

1980, indicating membership in BLC, and the moniker "Moreno." [Lodg. No. 15, Ex. L; Pet., Ex. L.] This item was an exhibit in a separate criminal case; there is no indication in the record that it was disclosed to Petitioner. [*See* Lodg. No. 15 at 26 and n. 13; Ex. P.][48] Additionally, Petitioner submitted a transcript of a change of plea hearing on April 30, 1999, in Los Angeles Superior Court (Lancaster), at which hearing Jose Narciso Reyes (date of birth August 13, 1980) entered a no contest plea to assault with a deadly weapon and admitted as true the elements of a charged gang enhancement, including that his moniker was "Moreno" and that he was a member of BLC. [Lodg. No. 15, Ex. M at 2, 9; Pet., Ex. M at 2, 9.]

With respect to Foss, Petitioner submitted Foss' handwritten notes of his interview with Jose Reyes—an exhibit at Petitioner's trial—which listed several monikers of gang members who Reyes identified as present at the party preceding the park shooting, none of whom Foss contacted to verify Reyes' account. [Lodg. No. 15, Ex. N; Pet., Ex. N.] Petitioner also submitted a police report authored by Foss regarding his investigation of Delinquent in January, 1998, for vandalism and graffiti at the same vacant house where Foss took photographs depicting "cross-out" graffiti during Petitioner's trial. [Lodg. No. 15, Ex. O; Pet., Ex. O.] The report—dated January 12,

---

**46.** Petitioner argued in his habeas petition in the California Supreme Court, and repeats here, that Delinquent's refusal to testify on advice of counsel is inherently suspect given that Delinquent's counsel, who represented him in a pending juvenile matter and whose advice Delinquent followed, concurrently represented Jose Reyes. Petitioner argues that counsel "fought hard" to keep Delinquent off the stand, attributing that effort to knowledge that if Delinquent testified, he would expose Jose Reyes as a liar and perjurer. [Lodg. No. 15 at 29–30.]

**47.** During that interview Delinquent also said that he had been contacted by Foss and his partner the previous October or November and they had offered to take care of a pending runaway charge if he would "give up" Michael Blumberg. [Lodg. No. 15, Ex. J; Pet. Ex. J.]

**48.** Petitioner asserts that the field identification card was found by his state habeas counsel in March 2003 during a review of criminal case files for Jose Narciso Reyes. [Pet. PEHB at 51, n. 27.]

1998—indicates that Foss observed and photographed gang style graffiti inside depicting "BLC" and "Delinquent" and that the photographs taken "will be kept in the investigative file." [Lodg. No. 15, Ex. O; Pet., Ex. O.] In a supplemental report, Foss relates that he contacted Delinquent on January 6, 1998, who "admitted to doing all of this tagging because 'Temple Street' was tagged inside" and "Temple Street and BLC do not get along" and that he tagged the house in mid-November. [Lodg. No. 15, Ex. O; Pet., Ex. O.] These reports were provided to the defense; however, the photographs referenced therein were not. [Lodg. No. 15, Ex. P; Pet., Ex. P.]

Of the three state courts in which Petitioner filed habeas petitions, only the superior court issued an order to show cause to Respondent. [See Lodg. No. 12, Ex. RR; Lodg. No. 13.] In that court, without expressly admitting that Hewitt testified falsely at Petitioner's trial, Respondent conceded that:

> newly discovered admissible and credible evidence concerning [Officer] Hewitt's general credibility and character to plant evidence and provide false information has been uncovered from which [the] court could conclude by a preponderance of the evidence that [Officer] Hewitt offered false evidence at Petitioner's trial concerning the circumstances of the April 23, 1995 traffic stop and arrest of Petitioner, his brother Michael and a third person. The People

further admit that they will not litigate the issue of whether or not [Officer] Hewitt actually provided false testimony at petitioner's trial.

[Lodg. No. 15, Ex. F; Pet. Ex. F.] Irrespective of this concession, Respondent maintained that Petitioner was not entitled to habeas relief because, in pertinent part, Hewitt's testimony, even if false, was not material to Petitioner's conviction and that Hewitt's misconduct was unknown to the prosecution before Perez' revelations, (which surfaced after Petitioner's conviction), accordingly, until then, there was no *Brady* material that the prosecution was obligated to disclose. [Lodg. No. 12 at 57–58.]

Each of Petitioner's state habeas petitions was submitted and denied by the respective state courts without an evidentiary hearing. [See Lodg. No. 11 (superior court); Lodg. No. 14 (court of appeal); Lodg. No. 16 (supreme court).] [49]

## C. *Federal post conviction proceedings*

At an evidentiary hearing before this court on June 3, 2008, Foss testified on direct examination that at the time of Petitioner's trial, he had been a deputy sheriff for about ten years, and had been a gang officer in Palmdale for about two and a half years. One of his responsibilities as a gang officer was to maintain gang files. [EHT at 11, 14.] Foss testified as an expert witness at Petitioner's trial, opining that Zuniga's shooting was gang-related and that Petitioner was an active member of Temple Street gang at the time of the shooting. [EHT at 14–15.] [50] Although he

---

**49.** The record indicates that the superior court held a hearing on March 29, 2002, at which counsel argued. [Lodg. No. 12, Ex. VV.] After receipt of additional written submissions from the parties, the court deemed the matter submitted. [See Lodg. No. 11.] Contrary to Respondent's representation in the answer [Ans. at 1], there is no indication in the record that the superior court held an evidentiary hearing.

**50.** Foss reiterated that he considered several factors (the same identified at trial) in forming his opinion that Petitioner was an active gang member: Petitioner's tattoos, his attire when arrested (baggy pants, belt buckles and necklace); the photograph of Petitioner and others flashing gang signs and gang roster given to him by Petitioner's girlfriend's mother Ms. Valiente; the "hard candy" found in Petitioner's possession in county jail; and the gang writings depicted in Petitioner's bed-

viewed and considered field identification cards and relied on Reyes' testimony in forming both of these opinions at trial, his opinion would be the same without them. [EHT at 24, 29–31.] Nor would his opinion that Petitioner's brother, Michael, was an active gang member change. [EHT at 31.] Hewitt testified at trial after Foss; Foss did not take Hewitt's testimony into account in rendering his opinions. Nor, to Foss' knowledge, had he talked to Hewitt before he testified. [EHT at 28–29, 31.]

Foss took three photographs during Petitioner's trial of graffiti inside a private residence. The photographs depicted "TST" (Temple Street) graffiti crossed out. The graffiti was placed there over a period of months. The first time he was in the residence, Foss saw mostly TST graffiti, but did not photograph it. The second time he was inside the residence, he saw the Temple Street graffiti crossed out and BLC graffiti. In January of 1998, he saw additional graffiti, including the moniker of "Delinquent" and BLC littered throughout the residence. On this occasion, he took photographs, which were maintained in an unrelated graffiti file on Michael Reyes (Delinquent). Foss did not recall whether he was asked about these photographs when he testified at Petitioner's trial. [EST at 32–33.]

On cross-examination, Foss testified that he got his information about Temple Street from LAPD officer Sam Martin, who was the Rampart expert gang investigator for Temple Street, as well as from a second Rampart officer whose name he did not recall. Foss documented these contacts—which occurred after Petitioner's arrest[51] and concerned Petitioner and Temple Street—but he has never produced that documentation. Foss received FI cards from Martin. He did not receive any information from Rampart regarding gang rivalries in Antelope Valley. [EHT at 34–35.]

Although Foss had not had discussions with Hewitt about his testimony, Foss had received information about the 1995 incident from Martin. Foss recalled that he was informed that Petitioner, his brother Michael, and another person were arrested, that they were identified as Temple Street members, that firearms were involved, and that a juvenile petition was submitted. [EHT at 35–38.] Foss stated that his contact with Martin was "for the purpose of having a prior predicate act." [EHT at 37.][52] He did not recall receiving a copy of the police report from Martin; he received a copy of it from Hewitt on the day Hewitt testified at Petitioner's trial. [EHT at 38.] The information he received from Martin factored into his opinion that

---

room. Foss stated he saw Petitioner's moniker "Whisper" in graffiti in Lancaster before the charged shooting. [EHT at 16–22.]

51. Foss' testimony as to when he received information from Rampart about Temple Street was somewhat inconsistent:

Q. So, up until the time Mr. Blumberg was arrested you had not had any contact with any Rampart officers regarding Temple Street?

A. That's correct.

. . .

Q. And had you had any dealings with respect to Rampart up until any time before October 29, 1997?

A. I'm not sure. I did handle a Temple Street stabbing prior to this case involving another Temple Street gang member. I don't know if I obtained any intelligence from Rampart regarding that case. I can't be for certain.

[EHT at 34–35.]

52. Although Foss did not explain what he meant by "prior predicate act," there is some indication in the record that it is common parlance with respect to proof of the "pattern of criminal gang activity" element of the charged gang enhancement (PC § 186.22(b)(1) and (e)). [See CT at 57; 235–38; RT at 779.]

Petitioner was an active member of Temple Street at the time of the shooting to the extent that it showed a prior gang association or allegiance. [*Id.*]

Foss' opinion that there was a pre-existing rivalry between Temple Street and BLC before the Zuniga shooting was based on information he received from confidential sources, i.e. gang members, about a shooting by Temple Street members directed at BLC members. Foss stated that he had received secondhand information that Petitioner was the shooter, but did not note that in the arrest report. Foss testified that did he not have an eyewitness account from a witness present at the shooting until BLC gang member Jose Reyes came forward during Petitioner's trial. [EHT at 39–40.]

Foss testified that he could not recall the exact date he first time he saw Temple Street graffiti in the vacant house, but that it was in September or October of 1997. He believed that the second time he was there and saw the cross-outs with BLC was mid-October. He did not photograph or otherwise document in a report his observations at either time, but believed he informed his partners about the cross-outs because they "were paying close attention to this particular area, the street." [EHT at 42–44.]

Foss took photographs the next time he saw graffiti at that location, which was the first week of January, 1998.[53] The photographs were different than the ones he took during Petitioner's trial; they focused on documenting the moniker of "Delinquent" and "BLC," not "cross-outs." Foss stated there was graffiti throughout the two-story house; as he testified at trial,

the graffiti was on-going. He talked to Michael Reyes ("Delinquent") about the graffiti he photographed, and submitted a juvenile petition against him based on it. [EHT at 44–45.]

The photographs taken in January were maintained in the graffiti file, which no longer exists.[54] Foss discussed them with the DDA prosecuting Petitioner's case, and almost certainly showed them to him as well; the prosecutor did not want to use them at Petitioner's trial. The reason Foss took photographs during Petitioner's trial was to depict cross-out graffiti that Foss "would have saw [sic] prior to this incident." [EHT at 45–46.] Foss did not know whether the defense requested access to the photographs he took in January; in his opinion, they were unrelated to Petitioner's case; they were not of "cross-outs." However, Foss recalled that one of the photographs taken in May depicted "Delinquent" near a cross-out. [EHT at 46–48.] Foss testified that the first time he saw Delinquent's tagging was in early January, 1998. He took two to four photographs; he did not then photograph the graffiti he previously observed which signaled a rivalry between BLC and Temple Street. [EHT at 51–52.]

To date, Foss still has no information substantiating Jose Reyes' identification of Petitioner as the park shooter. Foss testified that he contacted Jose Reyes after receiving word that Reyes wanted to talk to him. Reyes told him he was no longer an active BLC member and had stopped gang-banging, in part because of the park shooting. Foss was aware that Reyes identified himself as a BLC member a month later, on November 26, 1997, as

---

**53.** On cross examination, Foss testified that he although he had been in the vacant house several times between viewing the cross-out graffiti and January, he was not sure and had not documented them. [EHT at 51.]

**54.** There is no dispute, and the court finds, that neither the file which purportedly contained the photographs taken by Foss in January, 1998, nor the photographs themselves, still exist. [*See* MER, Ex. 6.]

documented in a field identification card. Foss did not recall how the field identification card came to his attention, assumed that he provided it to the prosecutor, and believed that it was included in the "packet" produced at trial. [EHT at 53–55, 57–58.] He acknowledged that on November 26, 1997, a search warrant was executed at Jose Reyes' residence, during which gang graffiti and evidence of gang membership was found in Reyes' bedroom; evidence that in his opinion was indicative of active gang membership. [EHT at 59.]

Foss testified that he spoke to Delinquent about the park shooting. Delinquent told Foss that he was present at the time. Foss testified that Delinquent "was unable to give an identification of who did the shooting." Delinquent told him he could not make an identification because it was too dark, or too dark to see from where he was at. [EHT at 60.] Foss recalled that Reyes testified that the park shooters identified themselves as members of "M.C." Foss was aware of "M.C." at the time, describing them as "tag bangers"—i.e., tagger crossing over the line to being gang members—who were "clicked up" (affiliated) with Temple Street. [EHT at 61–62.] Foss did not recall having any further contact with Jose Reyes after May, 1998, when he testified at Petitioner's trial, and through his tenure as a gang investigator, which ended in October 2000. [EHT at 63.]

On redirect examination, Foss testified that he first heard about the park shooting from a confidential informant who was not there but had heard about it from other gang members. Local police responded to the park, but no one was there and they found no evidence of a shooting. [EHT at 64.] Delinquent told him that he could not identify the shooter(s) from where he was positioned, but that he suspected that they were from Temple Street. Foss testified that the shooting itself—irrespective of the

identification of Petitioner as the shooter—was indicative of an active rivalry between the two gangs. [EHT at 65.] Foss testified that community service officers with his unit were tasked with photographing and reporting gang graffiti in the area, and that although useful for intelligence purposes, he did not commonly take photographs unless the graffiti was relevant to a crime. Graffiti may be multi-layered over a period of time. Graffiti on public walls is usually covered over; here, the graffiti was in a private residence. [EHT at 66–67.]

Foss contacted Martin within one to three days of the shooting. The opinions he gave at trial would not change if he could not rely on Martin's information. [EHT at 67–68.] In his experience, gang members commonly claim that they have left their gangs, and quite frequently they go back to them. [EHT at 68.]

On re-cross examination, Foss testified that he documented his conversation with Delinquent, but that he did not have that documentation, stating: "There was a legal reason ... during the trial." [EHT at 71.] Foss believed that the information Delinquent gave him—that he could not identify the shooter because it was too dark—was given to the prosecutor, but that at the moment he could not recall. [EHT at 70–71.]

Respondent did not dispute the court's proposed finding that Hewitt provided false testimony at Petitioner's trial, stating "that's been conceded for years." [EHT at 79.]

After the evidentiary hearing, the court granted, over Respondent's objection, Petitioner's motion to expand the record with the following documents:

1. Jose Narciso Reyes field identification card [Pet., Ex. L; MER No. 1]

2. Reporter's transcript dated April 30, 1999 of certified plea of defendant Jose Narciso Reyes [Pet., Ex. M; MER No. 2]

3. Foss' complaint and supplemental report of vandalism (graffiti) by Michael Reyes [Pet., Ex. O; MER No. 3]

4. Statement of Michael Reyes dated May 16, 1998 [Pet., Ex. J; MER No. 4]

5. A complaint report dated October 18, 1997 regarding the arrest of Jose Narciso Reyes and Esteban Diaz for vandalism (graffiti) and supplemental report dated November 26, 1997, regarding execution of search warrants at each suspect's residence. [MER No. 5] [55]

6. Certification that the file from Michael Reyes' vandalism case has been purged and no longer exists [MER No. 6] [56]

7. Copies of the photographs taken by Foss during Petitioner's trial (People's 20, 21, and 22) [MER No. 7].

## *STANDARD OF REVIEW*

The standard of review applicable to Petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

28 U.S.C. § 2254(d). A state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (as amended).

Under the AEDPA, the term "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *see also Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("clearly established Federal law" consists of holdings, not dicta, of Supreme Court decisions "as of the time of the relevant state-court decision"); *accord Carey v. Musladin*, 549 U.S. 70, 74, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006). However, federal circuit law may still be persuasive authority in identifying "clearly established" Supreme Court law or in deciding when a state court unreasonably applied Supreme Court law. *See Van Tran v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir.), *cert. denied*, 531 U.S. 944, 121 S.Ct. 340, 148 L.Ed.2d 274 (2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

---

55. The report indicates that "several pieces of paper, notebooks and a crossbow, all with BLC gang writing on them" were found in Reyes' bedroom, that three rounds of .22 caliber ammunition also were recovered (for which Reyes was arrested), and that "BLC" and "BLC Moreno" was admittedly written by Reyes inside of his closet. [MER No. 5]

56. The court notes, and has corrected, an apparent typographical error in the motion, which reads that the vandalism case and file purged is regarding Jose, not Michael, Reyes. [*See* MER at 3.]

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *Williams, supra,* 529 U.S. at 391, 413, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law under § 2254(d)(1) if the decision applies a rule that contradicts the governing Supreme Court law or reaches a result that differs from a result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *Williams, supra,* 529 U.S. at 405–06, 120 S.Ct. 1495; *see also Frantz v. Hazey,* 533 F.3d 724, 734 (9th Cir.2008) (en banc) (state court decision which uses "the wrong legal rule or framework" constitutes error under the "contrary to" prong of § 2254(d)(1)). However, the state court need not cite the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early, supra.*

A state court decision involves an "unreasonable application" of clearly established federal law under § 2254(d)(1) if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams, supra,* 529 U.S. at 413, 120 S.Ct. 1495; *Woodford v. Visciotti,* 537 U.S. 19, 24–27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam); *Chia v. Cambra,* 360 F.3d 997, 1002 (9th Cir.2004) (*quoting Lockyer,* 538 U.S. at 75, 123 S.Ct. 1166). In applying this standard, a federal habeas court may not overrule a state court decision based on the federal court's independent determination that the state court's application of governing law was incorrect or erroneous; rather, a decision may be rejected only if the state court's application of Supreme Court law was "objectively unreasonable." *Lockyer, supra,* 538

U.S. at 75, 123 S.Ct. 1166; *Woodford, supra; Williams, supra.*

When a state court decision is found to be contrary to or an unreasonable application of clearly established Supreme Court law, a federal habeas court "must then resolve the [constitutional] claim without the deference AEDPA otherwise requires." *Panetti v. Quarterman,* 551 U.S. 930, 932, 127 S.Ct. 2842, 2858, 168 L.Ed.2d 662 (2007); *see also Williams, supra,* 529 U.S. at 406, 120 S.Ct. 1495 (when a state court decision is contrary to controlling Supreme Court law, a federal habeas court is "unconstrained by § 2254(d)(1)"). In that instance, the federal habeas court's review of the constitutional claim is de novo. *Frantz, supra,* 533 F.3d at 735; *see also Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

Under § 2254(d)(2), "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The same "objective unreasonableness" standard applicable to challenges under § 2254(d)(1) applies to challenges to the state court's factual findings under 28 U.S.C. § 2254(d)(2). *See Bruce v. Terhune,* 376 F.3d 950, 954 (9th Cir.2004); *Taylor v. Maddox,* 366 F.3d 992, 999–1000 (9th Cir.), *cert. denied,* 543 U.S. 1038, 125 S.Ct. 809, 160 L.Ed.2d 605 (2004); *Torres v. Prunty,* 223 F.3d 1103, 1107–08 (9th Cir.2000). Analysis under § 2254(d)(2) begins with an intrinsic review of the state court record. *Kesser v. Cambra,* 465 F.3d 351, 358 n. 1 (9th Cir.2006) (en banc) (*quoting Taylor, supra* ). "Intrinsic challenges to state-court findings pursuant to the 'unreasonable determination' standard come in several flavors, each presenting its own peculiar set of considerations." *Taylor,*

366 F.3d at 1000–01 (listing, e.g.: "where the state court should have made a finding of fact but neglected to do so[;] ... where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard[;] ... and, where the fact-finding process itself is defective.").[57] If the state court's fact-finding process survives an intrinsic challenge, or is not challenged by the petitioner, the state court's findings are presumed correct unless rebutted by clear and convincing evidence:

> State court fact-finding may be overturned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error. *See* 28 U.S.C. § 2254(e)(1). Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive an intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2).

*Id.*, at 1000; *see also Kesser*, 465 F.3d at 358 n. 24 ("We held in *Taylor* that § 28 U.S.C. § 2254(e)(1) applies to challenges based on extrinsic evidence; or evidence presented for the first time in federal court, and requires proof by clear and convincing evidence. [cite] By contrast, we apply § 2254(d)(2) to intrinsic review of a state court's [fact-finding] processes, or

situations where the petitioner challenges the state court's findings based entirely on the state record.") (internal quotation marks and citation omitted).

In reviewing a state court adjudication, a federal habeas court looks to the last reasoned state decision as the basis for the state court's final judgment. *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005) (*citing Ylst v. Nunnemaker*, 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir.2002)). Petitioner raised the instant claims in successive habeas petitions filed in the California Court of Appeal and the California Supreme Court. This court looks through the California Supreme Court's summary denial of habeas relief to the state appellate court's written decision for purposes of applying the AEDPA standard of review. Where the state decision does not articulate a rationale for the judgment as to a particular claim, the court must independently review the record to determine whether the state court's adjudication was contrary to, or an unreasonable application of, controlling law. *Allen v. Ornoski*, 435 F.3d 946, 955 (9th Cir.2006); *Delgado v. Lewis*, 223 F.3d 976, 981–82 (9th Cir.2000).

## DISCUSSION

### A. *Knowing presentation of false testimony*

In ground one, Petitioner contends that the prosecution knowingly presented false testimony at trial by former LAPD Officer

---

**57.** *See, e.g. Moore v. Czerniak*, 534 F.3d 1128, 1148 n. 24 (9th Cir.2008) (concluding that the state court's fact finding process was "defective" and unworthy of AEDPA deference where the court entirely ignored relevant and highly conflicting evidence); *Kesser v. Cambra*, 465 F.3d 351, 358, 371 (9th Cir.2006) (concluding that state court's failure to consider contradictory evidence evident in the record rendered its factual finding unreasonable); *Taylor*, 366 F.3d at 1001 (a state

court's fact-finding process is defective, where, for example, the court "plainly misapprehend[s] or misstate[s] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable" or "where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim.").

Hewitt, Jose Reyes, and Foss. [Pet. at 13, 39–40.] Specifically, Petitioner contends that Hewitt's testimony regarding his arrest in 1995 was false; particularly, that firearms were present, and that the car that Petitioner was driving had a false compartment. [Pet. at 16–18; Pet. PEHB at 5–6, 9.] In addition, Petitioner alleges that Hewitt, Martin and other LAPD CRASH officers provided false information regarding Petitioner to Foss, which Foss relied upon when providing his expert opinion testimony at Petitioner's trial. [Pet. at 33.]

With respect to Reyes, Petitioner contends that Reyes falsely testified that he "left" the BLC gang in October, 1997 and was no longer a BLC gang member. [Pet. at 19.; Pet. PEHB at 14–18.] Petitioner further contends that Reyes falsely identified Petitioner as the shooter at the park incident days before the charged offenses. [Pet. PEHB at 18.]

Finally, Petitioner contends that Foss falsely testified that he first observed the "cross-out" graffiti depicted in the photographs taken during trial in October 1997, before the charged offenses occurred. [Pet. at 35; Pet. PEHB at 23–26.] Petitioner also contends—based on evidence which developed during the evidentiary hearing—that Foss falsely testified at trial that he had no eyewitness information regarding the park shooting other than that from Jose Reyes. [Pet. PEHB at 26.] [58]

It is alleged that the false testimony of each witness was material with respect to contested issues of material fact, to the respective witness' credibility, and to the extent it impeached Petitioner's contrary testimony. [Petition at 13–40, 53–66; Pet. PEHB at 10–11, 19–22, 32–47.]

### 1. *State appellate court decision*

The California Court of Appeal rejected Petitioner's false testimony claims, stating:

> [I]n order to be entitled to habeas corpus relief based on the admission of false testimony at trial, [the petitioner] must show that the evidence was "substantially material or probative." The [California] Supreme Court has held, "False evidence is 'substantially material or probative' if it is 'of such significance that it may have affected the outcome,' in the sense that '*with reasonable probability* it *could have* affected the outcome ....*'* [Citation.] In other words, false evidence passes the indicated threshold if there is a 'reasonable probability' that, had it not been introduced, the result would have been different.... The requisite 'reasonable probability,' we believe, is such as undermines the reviewing court's confidence in the outcome." (*In re Sassounian* (1995) 9 Cal.4th 535, 546 [37 Cal.Rptr.2d 446, 887 P.2d 527], orig. italics, citations omitted; see also *Strickler v. Greene* (1999) 527 U.S. 263, 280 [119 S.Ct. 1936, 144 L.Ed.2d 286]; *United States v. Bagley* (1985) 473 U.S. 667, 682 [105 S.Ct. 3375, 87 L.Ed.2d 481].) None of the testimony that [Petitioner] contends was false was "substantially material or probative."

> Officer Hewitt testified only on rebuttal to counter [Petitioner's] testimony that he was not a gang member.... On direct appeal, we held: that the trial court did not err in admitting Officer Hewitt's testimony, but even if it did, the error was harmless under any reversible error standard; and this was because there was overwhelming evidence of [Petitioner's] gang membership[ [59]].... Likewise, the testimony of

---

58. The court rejects Respondent's objection that this contention is unexhausted [*see* Resp. PEHB at 34], as unfounded in light of the record.

59. The "overwhelming evidence" referred to and recited later in the decision is as follows: ... Prior to the shooting in this case, [Petitioner] was involved in a shooting with an-

Mr. Reyes, even if partially false, was not material to [Petitioner's] guilt or innocence, nor is there a reasonable probability that it affected the outcome in this case.

[Petitioner] contends that the entire testimony of Deputy Foss was suspect because he was inconsistent on the issue of whether he had taken Polaroid pictures of certain graffiti being crossed out, indicating a gang rivalry. [Petitioner] has failed to demonstrate that the inconsistent testimony was deliberately false, much less that it was substantially material to his guilt and undermined the entire outcome of the case.

[Lodg. No. 14 at 1–2 (italics in original).]

### 2. *Applicable federal law*

 Under clearly established federal law, a prosecution's knowing use of false testimony, as well as the failure to correct false evidence, violates due process. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ("[I]t is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. [citations] The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.") (citations omitted); *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir.2005) (en banc) ("the rule has been clear for decades: a criminal defendant is denied due process of law when a prosecutor either knowingly presents false evidence or fails to correct the record . . . when . . . false evidence is introduced at trial"); *see also Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir.2008) ("[T]he constitutional prohibition on the 'knowing' use of [false] testimony applies when *any* of the State's representatives would know the testimony was false.") (italics in original). "To prevail on a *Napue* claim, the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false evidence was material." *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir.2006), *citing Hayes*, 399 F.3d at 984 (omission in original) (internal quotation marks omitted).

 Evidence is material for *Napue* purposes "[i]f there is 'any reasonable likelihood that the false testimony could have

---

other gang on October 19, 1997. [Petitioner's] half-brother was Michael Blumberg. [Petitioner] admitted driving Mr. Blumberg, who fired the fatal shots, to the scene of the shooting and to safety afterwards. [Petitioner] admitted harboring Mr. Blumberg after the shooting. Defense evidence indicated: [Petitioner] was expelled from Little Rock High School in 1993 for fighting; in 1994, [Petitioner] dropped out of Palmdale High School; [Petitioner] admitted joining the gang in early 1994; [Petitioner's] moniker within the gang was "Whisper"; [Petitioner's] Half-brother, Mr. Blumberg, was also a member of the gang; [Petitioner] lied about his whereabouts at the time of the shooting when he was arrested; and both [Petitioner] and Mr. Blumberg at the time of the shooting still had friends in the gang. Other testimony indicated: at the time of the shooting, [Petitioner] was wearing gang attire; when taken into custody, [Petitioner's] chrome belt buckle had the initials of the gang; [Petitioner's] head was clean shaven when he was apprehended in a manner typical of gang members; when arrested, [Petitioner] had gang tattoos on his forearm and back; the tattoo on his back consisted of the gang name in large letters; the jury had before it a photograph of [Petitioner] flashing a gang sign; while incarcerated, [Petitioner] had in his possession a state prison gang's "hit list"; and [Petitioner] failed to comply with a court order to appear at a lineup with his head clean shaven as it was when he was arrested. Finally, much of the evidence demonstrating [Petitioner] was a gang member was physical evidence.

[Lodg. No. 14 at 2.]

affected the judgment of the jury,' [if so,] the conviction must be set aside." *Belmontes v. Brown,* 414 F.3d 1094, 1115 (9th Cir.2005) (*quoting United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)), *rev'd on other grounds, Ayers v. Belmontes,* 549 U.S. 7, 127 S.Ct. 469, 166 L.Ed.2d 334 (2006).[60] In making this assessment, the fundamental question is whether Petitioner "received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Jackson,* 513 F.3d at 1072, *quoting Hall v. Director of Corrections,* 343 F.3d 976, 983–84 (9th Cir.2003) (per curiam) (*quoting Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).[61] False evidence may be material under this standard whether it is substantive or merely impeaching. *Hayes,* 399 F.3d at 986, *citing Napue,* 360 U.S. at 269, 79 S.Ct. 1173 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, ... [thus] [i]t is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon [petitioner's] guilt." (internal quotation marks and additional citation omitted)); *Silva v. Brown,* 416 F.3d 980,

987 (9th Cir.2005) ("Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case.").

■ Preliminary to applying this authority, the court takes stock of the undisputed evidence at trial set out above, which established that Petitioner's brother—a Temple Street gang member—exchanged words with, and subsequently shot and seriously wounded the victim, Ramon Zuniga—a BLC (purportedly rival) gang member; as well as that Petitioner was driving the car from which his brother exited, approached and then shot Zuniga, and that Petitioner picked up and drove his brother away from the scene (and thereby helped him escape).

Petitioner adamantly denied, however, that he knew his brother was armed and that he knew of or shared his brother's intent (or any gang-related motive) to shoot Zuniga. Petitioner denied that he was then "active"[62] in the Temple Street gang; Petitioner admitted that he had been active in the gang in the past and had not completely broken his ties to it.

---

**60.** Recently, in *Jackson* (a pre-AEDPA case), the Ninth Circuit distinguished "materiality" for a *Napue* violation as analytically distinct from that required for a *Brady* violation: "Whereas a *Brady* violation is material when 'there is a reasonable probability that the ... result of the proceeding would have been different,' [citation], a *Napue* violation requires that the conviction be set aside whenever there is '*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury.' " *Jackson,* 513 F.3d at 1076 (italics and emphasis in original) (citations omitted); *Cf. Morris v. Ylst,* 447 F.3d 735, 745 (9th Cir.2006) (stating that the test for materiality is the same for both violations). However, as the court in *Jackson* also noted, the fundamental question in each case is the same, i.e., whether Petitioner received a fair trial, meaning one engendering confidence in the verdict.

**61.** Harmless error analysis is inapposite to this determination; "the required finding of materiality necessarily compels the conclusion that the error was not harmless." *Hayes,* 399 F.3d at 984 (*citing Kyles,* 514 U.S. at 435, 115 S.Ct. 1555)).

**62.** In this regard, the record reflects that "active" gang membership is a somewhat fluid term, but that it denotes an allegiance to particular, fellow gang members, which is variously expressed by wearing identifiable clothing, exhibiting certain hand or "gang" signs or gestures, standing up for and protecting fellow members and an identifiable turf, and committing crimes (including, but not necessarily always, crimes of violence) to benefit the gang.

As discussed below, the trial record shows that the prosecution relied considerably on Foss and Reyes to establish that the charged offenses were committed on account of, and motivated by, a rivalry between the two gangs. More importantly for present purposes, the prosecution relied on the park shooting incident—of which Reyes solely testified—and the circumstances of Petitioner's 1995 arrest—of which Hewitt solely testified—to establish Petitioner's intent, knowledge and motive, as well as to impeach Petitioner's credibility and contrary testimony. The prosecutorial import of the testimony of these witnesses was not lost on the trial court, which repeatedly characterized the park shooting and basis for Petitioner's 1995 arrest as "signature offenses." [RT at 292–96 (Reyes' testimony); 1262–63, 1315–16, 1424 (Hewitt's testimony).]

### 3. *Hewitt*

Petitioner contends that Hewitt's trial testimony describing the circumstances of Petitioner's arrest in 1995 was false—in particular, that Officer Hewitt falsely testified that firearms were present and that the car that Petitioner was driving had a false compartment [Pet. at 16–18]—and that this false testimony was material under *Napue*. For the following reasons, the court agrees.

### a). *Pertinent background*

As mentioned above, in the midst of the defense case—after the defense presented testimony that Petitioner's criminal record consisted only of one arrest, which occurred in 1995 while in his brother Michael's company (for which Michael, but not Petitioner, served a term in juvenile custody) [RT at 1250, 1269–1270, 1320] and before Petitioner testified—the prosecutor alerted defense counsel and the trial court that he intended to call Hewitt on rebuttal. Particularly, the prosecutor proffered that Hewitt would testify as to the purported circumstances resulting in Petitioner's arrest—namely, that Petitioner was driving, with his brother and another passenger (all three Temple Street members), with firearms present, in rival gang territory. [RT at 1262–63, 1329.]

In discussions that followed, the trial court repeatedly commented on the "commonality" between the present case and the purported "facts" resulting in that arrest—characterizing the latter as "a signature offense." [RT at 1263, 1316–17.] Defense counsel conceded that the evidence was admissible [i.e. prior bad acts conduct admissible to show motive, scheme, plan, etc. pursuant to Cal. Evid.Code § 1101(b) ] assuming that the witness—Hewitt—"has personal knowledge of the facts." [RT at 1262–67, 1329.]

In apparent anticipation of Hewitt's testimony, Petitioner admitted on direct examination that in 1995, he, his brother Michael and another individual were stopped while driving late at night and arrested. Petitioner testified that he did not see a gun in the car. [RT at 1371.] The prosecution pursued this on cross-examination, during which Petitioner testified that he was told after the arrest that firearms were found in the car. Petitioner repeated that he did not see any guns in the car, and testified that the car did not have any hidden compartment. [RT at 1411–12.]

After Petitioner so testified, the prosecutor reiterated his intent to call Hewitt on rebuttal to testify about the 1995 arrest, and then added that he would elicit Hewitt's opinion why Petitioner and his companions were in the area where the arrest took place. Defense counsel objected to the latter as speculative, irrespective of whether Hewitt qualified as an expert. The court overruled the objection, contin-

gent on Hewitt so qualifying. [RT at 1421–25.] [63]

On rebuttal, and consistent with the prosecutor's proffer, Hewitt testified that in 1995 he arrested Petitioner, Petitioner's brother Michael, and another individual— all three known Temple Street members— after he observed them surreptitiously driving—Petitioner at the wheel—late at night in rival gang territory and saw the front passenger pass a handgun to Michael, the right rear passenger. [RT at 1429–32.] Hewitt further testified that he "recovered" two automatic handguns from a hidden compartment in the armrest area of the right rear passenger seat.[64] Consistent with the trial court's ruling, Hewitt was permitted to testify that in his expert opinion, Petitioner and his companions were in the area to commit an assault with a deadly weapon. [RT at 1432–35, 1438.] On redirect examination, Officer Hewitt again testified that he saw the individual sitting next to Petitioner pass a gun to the rear passenger. [RT at 1438.]

### b). *Discussion*

As Respondent has long conceded [EHT at 78–79; Pet., Ex. F at 17–18], and the record bears out, there is ample reason to conclude that Hewitt's testimony was false. The court so finds. Notwithstanding this concession, Respondent contends, as she did throughout state collateral review, that Hewitt's false testimony was not material to Petitioner' conviction. [Partial Supp. Ans.; Resp. PEHB at 9–17.] As noted above, the state appellate court agreed, concluding that Officer Hewitt's testimony was not "substantially material or probative" because Officer Hewitt "testified only

on rebuttal to counter [Petitioner's] [conflicting] testimony that he was not a gang member" and "because there was overwhelming evidence of [Petitioner's] gang membership." [Lodg. No. 14 at 2.] This determination was unreasonable for several reasons.

First, the conclusion that Hewitt "testified only on rebuttal to counter [Petitioner's] testimony that he was not a gang member" is an unreasonable determination of the facts in light of the evidence and argument presented at trial. Indeed, with respect to Petitioner's purported equivocation regarding his gang membership, Hewitt's testimony largely corroborated Petitioner's admission that he was an active Temple Street member at the time he was arrested by Hewitt in 1995.

Rather, as the record makes clear from the outset, the prosecution offered and used Hewitt's testimony regarding Petitioner's 1995 arrest—namely, that Petitioner was driving suspiciously, accompanied by his brother (and another Temple Street member), with firearms present, and under circumstances suggesting an intent to assault rival gang members—for the primary and specific purpose of drawing the obvious parallels between Petitioner's conduct and professed lack of knowledge then and now, and as proof that Petitioner lied when he testified that he did not—as then—see a firearm in his car or know that his brother was armed. In this critical respect, this "other crimes evidence" was neither cumulative to nor corroborated by any other evidence at trial.

The import of this "other crimes evidence" to the prosecution was succinctly

---

**63.** It is this ruling, which underlies Petitioner's challenge to Hewitt's testimony on direct appeal, and which the state appellate court upheld on direct review. [*See* note 38, *supra.*]

**64.** Officer Hewitt testified that when he later attempted to show the "false compartment"

to the juvenile court judge presiding over the case subsequently filed against Petitioner's brother and passenger, the molding on the side of the car "had been completely replaced" and that Petitioner's father had custody and control of the car at the time. [RT at 1435–36.]

articulated by the prosecutor during closing argument, during which the prosecutor expressly and repeatedly argued that the jury could find the requisite intent and knowledge to commit the charged attempted murder, assault and conspiracy based on Hewitt's testimony alone. [RT at 1461–62, 1465–66, 1470–72, 1495–96.] The record to this effect could not be clearer:

Is this the only way to get to the agreement and intent? Not at all. The defendant was previously arrested under similar circumstances.

[¶]

... He didn't shoot anybody in that case. He didn't have a chance to.

[¶]

What we know is this defendant, once again, had control of a vehicle. Different car that night. They were in rival gang territory. That's what Officer Hewitt told you. They had guns in the car. Not one gun, but two guns. The defendant was with his brother, a Temple Street gang member, and was with another Temple Street gang member, and on that particular night a gang war was going on.

Does that sound familiar? Maybe if Detective Foss had been riding around on October 29, 1997, had a reason to stop the defendant. We would almost have the exact scenario and he wouldn't have had a chance to shoot anybody that day.

[RT at 1469–71.] The prosecution went further, arguing that Hewitt's testimony also proved that Petitioner lied about the 1995 incident; particularly, that he lied when he testified that he did not know that guns were present in the car:

But, more importantly, the defendant lied to you about what took place in Los Angeles in April of '95. He said, you know, 'I was told there was some guns

in the car. I didn't know. I didn't know.'

What did Officer Hewitt tell you? ...

... [H]e said, 'I watched the passenger in a Toyota Tercel,' all right, not a Suburban, not a huge Cadillac, not a big Lincoln Town Car, but a passenger in a Toyota Tercel. We know how big—you know, it's a small, compact car. 'I saw ... the passenger in the front seat pass a gun from the front seat to the back seat.'

That's what he saw from another police car. I mean, from another car. He could see a gun in the car.

But this defendant will come into this courtroom, ladies and gentlemen, and tell you, 'I was told there was a gun in the car. I didn't know nothing about that, Officer Hewitt.'

There was a hidden compartment in that car. The defendant's car.

[Petitioner] said, ladies and gentlemen, 'I promise you I don't know anything about a hidden compartment being in that car.'

He lied to you, ladies and gentlemen. He lied to you.

[RT at 1495–96.] Indeed, the prosecutor argued that the jury could, and should, conclude on the basis of Hewitt's testimony alone, that Petitioner was lying about everything. [RT at 1496.] Concomitantly, the prosecutor repeatedly vouched for Officer Hewitt's credibility: "Officer Hewitt is either lying—he either drove 80 miles from Los Angeles to lie to you, or he's just so off base in his opinion as to really be, you know, I'll say it, worthless as a police officer;" [RT at 1480, 1495]; Officer Hewitt "drove 80 miles from L.A." to give the jury the "entire picture" in response to Petitioner's testimony; to "talk about what really went on that night." [RT at 1577–78.] [65]

**65.** As discussed below, Petitioner separately contends that these remarks constitute imper-

Neither the state appellate court's decision, nor Respondent, make any mention of the prosecutor's argument, even though, as the Supreme Court has observed, "[t]he likely damage [of the false evidence] is best understood by taking the word of the prosecutor." *Kyles,* 514 U.S. at 444, 115 S.Ct. 1555. Nor does the state appellate court's decision so much as acknowledge the clearly articulated "other acts" import of Hewitt's testimony intrinsic in the trial record.

Nevertheless, Respondent is adamant that the state appellate court was well aware from the outset of direct review, through the argument of the parties, of the potential damage caused by Hewitt's "other acts" testimony on Petitioner's defense. [*See, e.g.* Resp. PEHB at 3–4] [66] Respondent urges the court to infer from this that the state appellate court implicitly rejected—and reasonably so—that Hewitt's false testimony was material for this reason. The court disagrees that this inference is readily or reasonably drawn from the state appellate court's decision or that it is otherwise supported by the record.

By its express terms, the state appellate court's decision—which qualifies Hewitt's testimony *only* as countering Petitioner's portrayal of his gang status—effectively excludes, rather than invites, the inference Respondent advances. Moreover, an

equally permissible, if not more persuasive, inference is that the state court flatly ignored or deemed inconsequential the intrinsic record excerpted above.[67] Given the breadth of that record, the state appellate court's view of the nature of Hewitt's testimony and the manner in which it was put to use is simply unreasonable. *See Moore,* 534 F.3d at 1148 n. 24 (state court's fact finding process "defective" and unworthy of AEDPA deference where the court entirely ignored relevant and highly conflicting evidence); *Kesser,* 465 F.3d at 358, 371 (state court's failure to consider contradictory evidence evident in the record rendered its factual finding unreasonable); *Taylor,* 366 F.3d at 1001 (state court's fact-finding process defective where the court "plainly misapprehend[s] or misstate[s] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim" or "where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim.").

Second, the state appellate court's conclusion that Hewitt's testimony was merely cumulative to the otherwise "overwhelming" evidence of Petitioner's gang membership is similarly unreasonable in light of the record. Given the nature of the charges—particularly that the motive for attacking Zuniga was predicated on an

---

missible vouching by the prosecutor.

**66.** Respondent goes to some length to point out that the "prejudicial impact" of Hewitt's testimony was reviewed and found to be lacking by four courts before the instant petition reached the undersigned: first by the state appellate court on direct appeal, then by the superior court and state appellate court on state collateral review, and fourth, in an initial Report and Recommendation filed by the previously assigned Magistrate Judge. [Resp. PEHB at 3–9.] However, AEDPA dictates that only the *last* reasoned state court decision (and any decision it specifically adopts) guides this court's review of Petitioner's

claims. For this reason, the court declines Respondent's apparent invitation to delve into and address the merits (or lack thereof) of any previous court's decision with respect to the present claims, other than that which the AEDPA directs the court to review.

**67.** This inference is further strengthened by the state appellate court's reliance on its determination on direct appeal that any error in the admission of Hewitt's testimony was "harmless under any reversible error standard ... because of the overwhelming evidence of [Petitioner's] gang membership." [Lodg. 14, at 2.]

existing rivalry between Temple Street (of which Petitioner was a member) and BLC (of which Zuniga was a member), as well as the gang enhancement, which required proof that the offenses were committed out of an allegiance to and for the purpose of benefitting the Temple Street gang—Petitioner's gang status at the time of the offenses was indisputably important at trial. To this end, considerable evidence of Petitioner's ties to Temple Street—including Petitioner's clothing (baggy pants and belt buckle) when arrested, his tattoos, items seized from and photographs taken of his bedroom, the photograph depicting Petitioner and others flashing gang signs and the roster of gang names obtained from his girlfriend's mother, and the so-called "hard candy list"—was introduced by the prosecution in the case-in-chief.

Petitioner did not, however, seriously dispute that at the time of the charged offenses he was a member of the Temple Street gang.[68] However, as the sum of the gang-infused testimony presented to the jury demonstrates, gang status is a fluid concept, and in many respects a matter of perspective and degree. Petitioner explained that although he associated with Temple Street members, he was not at the time of the offenses "active" in the gang; however, he admitted he was "active" at the time he was stopped and arrested by Officer Hewitt in 1995. The distinction is not without meaning; the record indicates that "active" in this context denotes, among other things, a gang member's willingness, if not proclivity, to engage in orchestrated conduct out of allegiance to the gang and its members. At its extreme, this includes committing acts of violence.

Not surprisingly, whether and the extent to which the gang evidence noted above was indicative of Petitioner's "active" membership in Temple Street at the time of the offenses—meaning, according to the prosecution's theory of the case, engagement gravitating toward the extreme (violent) end of the spectrum—or represented the past or was otherwise innocuous—as urged by the defense—was extensively disputed at trial. It is in this light that the import and affect of Hewitt's testimony regarding Petitioner's gang membership is properly gauged. Because of the alleged similarities between the prior incident and the current offenses—both argued to be indicative of planned gang violence directed at a gang rival—Hewitt's testimony uniquely impeached Petitioner's claim that he had foregone "active" gang life, and that he was, essentially, merely present and unaware of his brother's intentions.[69] Thus, contrary to the state ap-

---

68. The state appellate court's assertion that "[P]etitioner testified that he was both a gang member and not a gang member" [Lodg. No. 14 at 2], although technically correct, mischaracterizes the record as a whole.

69. Respondent takes issue with the court's characterization of Hewitt's testimony as "uniquely impeaching Petitioner's claim that he has foregone active gang life" (previously made in the court's Order re: Further Proceedings, and which has been expanded on herein), arguing that "Hewitt's testimony has no bearing on whether Petitioner subsequently decided to stop active gang banging" and that this court has erroneously concluded that "Hewitt's testimony somehow precluded Petitioner from leaving the gang, or asserting to a jury that he left the gang." [Resp. PEHB at 11.] Respondent misunderstands the court's point. The nuances observed between "active" and "other than active" gang membership derives from the record, including, in part, from Petitioner's testimony. The court did not, and does not—because the record does not—assert a causal link between the false incident described by Hewitt and Petitioner's timing and purported reasons for foregoing "active" participation in the gang. In this regard, Petitioner's general "knowledge of shootings" and "of friends dying" during the time he was admittedly active in the gang [Resp. PEHB at 10–11] hardly carries the same weight as the testimony of a police officer who purportedly caught Petitioner, his brother and another Temple Street

pellate court's conclusion, Hewitt's testimony was not simply cumulative to other evidence of Petitioner's gang proclivities.

In sum—and contrary to the state appellate court's determination—the record reflects that Hewitt's testimony served both substantive and impeachment purposes other than merely rebutting Petitioner's purported gang status. *Napue* directs that false evidence, whether used substantively or for impeachment purposes, is material if there is any reasonable likelihood that it could have affected the jury's judgment. The fundamental question which guides the court's application of this standard is whether Petitioner's trial resulted in a verdict "worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555; *Hall,* 343 F.3d at 983–84.

In order to convict, the jury had to find, at a minimum, that Petitioner knew his brother was armed and that Petitioner, like his brother, harbored the requisite specific intent to commit murder. Without any mention of either of these key disputed elements, the state appellate court summarily concluded, as noted above, that Hewitt's testimony "was not material to [Petitioner's] guilt or innocence, nor is there a reasonable probability that it affected the outcome of the case" because Hewitt testified "only to counter [Petitioner's] testimony that he was not a gang member" and "there was overwhelming evidence of [Petitioner's] gang membership. [Lodg. No. 14 at 2.] This determination constitutes an unreasonable application of *Napue* on the law and the facts.

As previously discussed, the apparent factual predicate for the state court's determination—that Hewitt's testimony was pertinent only to counter Petitioner's purported equivocation about his gang status—cannot, and does not, withstand

member on the verge of committing a "signature offense" involving the presence of fire-

intrinsic review of the trial record. By ignoring the far more exacting and damaging import of Hewitt's testimony—the articulation of which during the prosecutor's closing argument could not be more clear—the state court's decision rests on an unreasonable determination of the facts. This flaw necessarily infects the state court's determination that Hewitt's testimony was, in any event, immaterial because of the "overwhelming evidence of Petitioner's gang membership."

Unlike reliance on Hewitt's "signature evidence," prosecutorial resort to evidence of Petitioner's gang membership—whether or not viewed as "overwhelming"—as substantive proof of intent and culpability is improper. *See Kennedy v. Lockyer,* 379 F.3d 1041, 1055–56 (9th Cir.2004) (evidence of gang membership cannot be introduced to prove intent or culpability; such evidence creates the risk of guilt by association as well as the risk that the jury will equate gang membership with the charged crimes (and citing cases in accord)); *Williams v. Walker,* 2008 WL 4809223, *6 (C.D.Cal. October 30, 2008) (Case No. CV 06–07314–FMC (SS) (while gang membership may be used to prove a material fact, such as motive, bias and identity, "use [of gang membership] to prove a substantive element of the charged crime would likely be unduly prejudicial" (*citing Kennedy*) (additional citations omitted)).

■ As *Napue* and its progeny make clear, whether the materiality standard is met depends on the intended and actual use of the false evidence, and whether that evidence was otherwise corroborated, or effectively impeached, by non-tainted evidence such that it is not reasonably likely that the false evidence could have affected the jury's judgment. As to the two pivotal

arms.

issues of knowledge and intent, Hewitt's testimony provided the jury with "signature" evidence from which it could reasonably infer, as was urged by the prosecution, not only that Petitioner knew that his brother was armed and shared his murderous intent, but also that Petitioner lied when he testified to the contrary. Thus, Hewitt's testimony directly undermined the core of Petitioner's mere presence (and accessory after the fact) defense. Revelation that Hewitt's testimony was false would have deprived the prosecution of this critical prosecutorial ammunition, as well as cast residual doubt on Foss' expert testimony, admittedly based in part on information Foss received from Hewitt's unit, i.e., "CRASH." [70]

Without Hewitt's testimony, Petitioner's testimony regarding the circumstances of his 1995 arrest—particularly, his denial of knowledge of the presence of firearms—would have remained unrebutted. Although not the only prosecution witness to provide damaging "signature evidence," unlike Jose Reyes (a gang member with a reputation for lying, and whose "prior

---

70. In this regard, Petitioner alleges that "Officers Hewitt, Martin and other CRASH officers provided false information regarding Petitioner to Deputy Foss, which Deputy Foss relied upon when providing his expert opinion testimony at petitioner's trial." [Pet. at 33.] The record shows, and the court so finds, that Foss relied upon information about Petitioner and Temple Street that he obtained from discredited CRASH officers, which information is at least suspect, if not—as in the case of Hewitt—worse. Foss' reliance is clear from his trial testimony. Foss testified that he based his opinion that Petitioner was an active gang member in part "on information I received from other law enforcement, particularly Rampart area CRASH [LAPD's gang unit] officers who also have gang files or gang information on the defendant." [RT at 409–09.] Foss also testified that Temple Street gang members are involved in and "commit a wide range of crimes" including murder, assaults and "drive-bys;" that his knowledge and opinion of the activities of Temple Street members was based on "several contacts" he has had "with Rampart CRASH detectives;" and that "I have spoken ongoingly with Detective Martin. He's their expert on Temple Street. I have talked with other of their CRASH detectives there, and was given information regarding the activities of Temple Street." [RT at 408–09, 457–58.] In addition to documenting Hewitt's fall from grace (and although denied *Brady* discovery regarding Martin and other CRASH officers), Petitioner alleged during state collateral review (based on his independent investigation and review of materials received regarding Hewitt) that: Martin had been relieved of duty pending investigation of his participation in the corruption scandal; that Martin was implicated in criminal drug activity in 1995; and that convictions were set aside on the DA's motion as a result of Martin's percipient misconduct in two cases (one as an arresting officer). [Lodg. No. 12 at 46–48.] As far as the court can tell, Respondent did not respond to these allegations; rather, Respondent contended, and the state courts apparently agreed, that Martin and other CRASH officer's misdeeds were wholly irrelevant to Petitioner's case because these officers did not testify at Petitioner's trial. This view misses Petitioner's point—that Foss' expert opinion offered at trial is tainted to the extent it relies on information received from discredited CRASH officers. Foss' trial testimony that he based his opinion that Temple Street was a violent gang on information received from CRASH officers was unequivocal. Whether or not Foss spoke to Hewitt personally about Petitioner, Foss clearly relied on the circumstances of Petitioner's arrest—which Foss testified he learned about from Martin, the Temple Street "expert"—including that firearms were alleged to be present. Thus, discrediting the source(s) of Foss' information about Temple Street necessarily impeaches his opinion, as well as his opinion that Petitioner was an active member in the gang. Foss' evidentiary hearing testimony that his opinions would not change if he was unable to rely on information he received from Martin or Hewitt does not necessarily dissipate the taint Petitioner identifies. Although not rising to the level of a *Napue* violation, the court agrees that Foss' reliance on information received from Hewitt and other discredited CRASH officers is an additional consideration which undermines confidence in the jury's decision.

bad acts" testimony, as discussed below, was itself highly suspect), Hewitt presented as an ostensibly upstanding, unbiased, and dedicated law enforcement officer. Moreover, the un-tainted evidence of Petitioner's conduct before and after the shooting did not necessarily compel an inference that Petitioner knew that his brother was armed and that Petitioner agreed, and intended, that Zuniga be murdered. A contrary inference, consistent with Petitioner's testimony, can be drawn from Zuniga's testimony that (other that Petitioner's purported statement "its all about Temple Street") Michael was the protagonist, and that the gun was concealed and not visible before Zuniga was shot. [*See* RT at 106–09, 113, 116, 119 135.] None of the physical evidence connecting Petitioner to Temple Street suggests any inclination by Petitioner to engage in armed, violent crimes. Additionally, unlike Hewitt, the jury requested readbacks of both Zuniga and Reyes' testimony, which suggests that the jury had some question or uncertainty as to the testimony of both. *See, e.g. Horton v. Mayle*, 408 F.3d 570, 579 (9th Cir. 2005) (observing that the jury's request for a readback of the testimony of a key prosecution witness is an indication that the jury had some reservations about that testimony).[71]

Nevertheless, Respondent urges a contrary conclusion, arguing that the state appellate court reasonably determined that Petitioner was not prejudiced by the admission of Hewitt's testimony in light of the "overwhelming" evidence at trial. [Resp. PEHB at 5–6, 12–17.] In support, Respondent urges that deference is due to the state appellate court's determination on direct appeal, reiterated in the state appellate court's decision on collateral re-

view, that any error in admitting Hewitt's testimony was "harmless under any reversible error standard ... because there was overwhelming evidence of defendant's gang membership." [Lodg. No. 14 at 2.] The court disagrees for several reasons.

As noted, on direct appeal, Petitioner challenged as improper the admission of Hewitt's opinion testimony that Petitioner and his companions were in a rival gang neighborhood for the purpose of committing a gang related assault, i.e., a drive-by shooting. [Lodg. No. 7 at 10–11.] The state appellate court disagreed, finding as a matter of state law that the trial court did not abuse its discretion in allowing Hewitt's opinion "regarding the circumstances of the night in question[,]" and that any error in allowing the evidence was harmless in any event because it was cumulative to other evidence of Petitioner's gang membership and "in light of the other overwhelming evidence of [Petitioner's] guilt." [Lodg. No. 7 at 13–15; *see also* Footnote 38, *supra.*] This determination, however, does not purport to address, nor does it in any way resolve, the qualitatively different and meritorious claim raised herein under *Napue:* namely, whether there is any reasonable likelihood that Hewitt's false testimony that Petitioner engaged in criminal activity strikingly similar to the circumstances in the charged offenses—which false evidence the prosecutor pointedly and repeatedly urged to be sufficient to establish the contested elements of intent and knowledge, as well as Petitioner's lack of credibility—could have affected the judgment of the jury.

Moreover, the court cannot defer to the state appellate court's characterization of the evidence as "overwhelming" irrespective of Hewitt's testimony. At the outset, for example, the state appellate court

71. As noted above, in addition to requesting a readback of Zuniga's testimony, the jury inquired in a separate request whether it was

required to find that Petitioner made to Zuniga the exact statement alleged in the information. [*See* CT at 148.]

states that "[p]rior to the shooting in this case, [Petitioner] was involved in a shooting with another gang on October 19, 1997." [Lodg. No. 14 at 3.] The decision also discounts Reyes' testimony as immaterial to the outcome of the case. [*Id.* at 2.] As discussed herein, substantial reason exists to discredit Jose Reyes' account of that shooting, as well as his credibility.

As further support, the state appellate court decision cites defense evidence indicating that Petitioner was "expelled from Little Rock High School in 1993 for fighting" and that "[Petitioner] dropped out of Palmdale High School;" and states that "[Petitioner] failed to comply with a court order to appear in a line-up with his head clean shaven as it was when he was arrested." [Lodg. No. 14 at 3.] Yet, both of these factual representations are meaningless in light of the record as a whole. As to the first, although true, the evidence also showed that however checkered Petitioner's high school years, Petitioner received several certificates of achievement and graduated from Desert Winds High School in 1996. [RT at 1229–31.] As to the latter, the evidence did not establish that it was Petitioner's fault that he was not prepared for the initial line-up, nor that he refused at any time or in any way to cooperate with deputies in preparation for the line-up. Even the prosecutor admitted during closing argument that he did not know whose fault it was that Petitioner was not prepared for the first lineup. [RT at 1494.]

Moreover, however considerable and pertinent the physical evidence of Petitioner's gang ties [Lodg. No. 14 at 3], there is no indication in the record that this evidence suggests that Petitioner had embraced violence or that his allegiance to Temple Street extended to the commission of acts of violence (unlike and in comparison to, for example, the weapon and ammunition found by Foss' colleagues during a search of Jose Reyes' bedroom, discussed below). Other indicia relied upon by Foss as indicia of this sort of allegiance, i.e., "active" gang membership, is also lacking. For example, there is no evidence that Petitioner's moniker was found in the vacant residence where the cross-out graffiti was observed. In addition, the state appellate court fails to credit, as Foss admitted, that none of the field interview cards generated by local deputy sheriffs documenting "stops" of Petitioner indicated that he was in the company of known Temple Street gang members, other than his brother. [RT at 612.]

Petitioner's possession of the "hard candy list" while in custody also factors into the state appellate court's factual recitation. [Lodg. No. 14 at 3.] However relevant to issue of Petitioner's gang membership, the record indicates that the "hard candy list" was discovered well after the charged offenses and while Petitioner was in custody waiting trial. Thus, his possession of this document would appear to shed little light on the pivotal issues of knowledge and specific intent at the time of the shooting.

Petitioner's actions before and after the shooting, and the fact that he lied as to his whereabouts at the time of the shooting,[72]

72. In this regard, Respondent goes farther, arguing that the record is "replete with instances where Petitioner destroyed his credibility with dishonesty or equivocation which was obvious and clumsy." [Resp. PEHB at 14.] In support, Respondent contends that Petitioner gave an unbelievable account of the shooting at trial and that in addition to lying to the arresting officers, claimed that his

brother might have acted in self-defense, that he tried to avoid an identification lineup, that he changed his story after learning that he had been identified at the line-up by Zuniga and doing some legal research; gave evasive answers whether he knew that Temple Street was involved was in committing murders and regarding the meaning of certain gang gestures, and that his explanation as to when he

round out the state appellate court's factual recitation.[73] Unquestionably, reasonable inferences in favor of guilt can be drawn from Petitioner's conduct. One might reasonably conclude, particularly through the lens of AEDPA deference, that the evidence recounted by the state appellate court, even if not overwhelming, was sufficient to uphold Petitioner's conviction.

However, materiality is not measured by whether there is sufficient evidence to support the conviction. *See Strickler v. Greene*, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), citing *Kyles*, 514 U.S. at 434–35, 115 S.Ct. 1555. Rather, the question is whether there is a reasonable likelihood that the false evidence *could* have affected the judgment of the jury. That standard is met here. The state appellate court's apparent decision that the evidence was so overwhelming as to the pivotal issues of knowledge and specific intent that there is no reasonable likelihood that Hewitt's false testimony—placing firearms in Petitioner's near presence under circumstances strikingly simi-

lar to the charged offenses—could have affected the judgment of the jury is patently unreasonable on the law and the facts. 28 U.S.C. § 2254(d).

### 4. *Jose Reyes*

■ Petitioner alleges that Jose Reyes' falsely testified at trial that he "left" the BLC gang in October, 1997 and was no longer a BLC gang member, and that this false testimony was material under *Napue*. [Pet. at 19; Pet. PEHB at 14–18.] Petitioner further contends that Reyes falsely identified Petitioner as the shooter at the park incident days before the charged offenses. [Pet. PEHB at 18.]

#### a). *Pertinent background*

The charged offenses occurred on October 29, 1997. Petitioner's trial began on April 28, 1998. On May 7, 1998, the prosecutor informed the court that Foss had been contacted the day before, May 6, by Jose Reyes, a purportedly former BLC gang member. According to Foss, Reyes contacted him for the purpose of having Reyes' name removed from the sheriff's

---

felt able to tell the truth was unbelievable. [Resp. PEHB at 14–15.] Much of Respondent's argument, however, is inconsistent with or exaggerates the record. For example, as set out above, the record shows that other than Petitioner's denial that he made any statement to Zuniga, Petitioner's actions (as he described them) were largely corroborated by the prosecution witnesses. Nor did the evidence establish that Petitioner himself was responsible for the failure of the initial lineup to go forward.

Moreover, although certainly relevant to possible consciousness of guilt, Petitioner's initial denial of being involved and admission that he hoped that he would not be identified by Zuniga are hardly surprising. Petitioner did not witness the shooting itself; he knew only what his brother told him and could not know whether or not the shooting was in self-defense; thus, any surmise he had in this regard is not necessarily inconsistent with his belief that the shooting was wrong. Nor is it

necessarily inculpatory that having been identified by Zuniga as the driver of the car, Petitioner would attempt to find out what basis there may be for holding him criminally liable for the shooting. In short, the "impeachment" Respondent highlights is not so compelling as to tip the balance in favor of a conclusion that the evidence at trial—as to the pivotal issues of knowledge and intent—was "overwhelming" so as to render Hewitt's false testimony immaterial.

**73.** The state appellate court's summary of this evidence, including that "[Petitioner] admitted driving Mr. Blumberg, who fired the fatal shots, to the scene of the shooting ..." [Lodg. No. 14 at 2], is inaccurate. The record shows that the shots fired were life threatening, but not fatal. Additionally, Petitioner admitted that he and his brother were driving down the street when they observed Zuniga walking, and that Michael Blumberg exited Petitioner's car after Petitioner drove past Zuniga and as he slowed with traffic at a traffic signal.

gang file. During their discussion, Reyes volunteered that he and other BLC gang members were shot at in a park on October 18, 1997,[74] and that Petitioner was the shooter. After a hearing, the court ruled that the prosecution could call Reyes, characterizing the October 18th park shooting as a "signature offense." [RT at 292–97.]

A few days later, Reyes testified at Petitioner's trial. At the outset of direct examination, the prosecutor elicited the following from Reyes:

Q. And are you now a member of BLC?

A. No. I no longer bang with them.

. . .

The Court: For the record, you said you no longer bang with them. What does "bang" mean?

A. I no longer bang. It means I no longer do anything for the gang.

. . .

Q. Is it fair to say that you no longer claim BLC anymore?

A. No, sir.

. . .

The Court: Also, for the record. What does "claim" mean, when you claim a gang?

A. "Claiming" means they are from the gang.

[RT at 317–18.]

Reyes proceeded to testify that on October 18, 1997, he and others from BLC attended a party at which Petitioner, his brother, and other Temple Street gang-members were present and at which a fight broke out between members of the two gangs.[75] According to Reyes, there were no problems or any rivalry between the two gangs before that party.

Reyes testified that after leaving the party, he and other BLC members were shot at while congregating at a park. [RT at 318, 328, 336–55.] Reyes identified Petitioner as the shooter. Reyes testified that he thought the firearm Petitioner used was "at least a .22," that Petitioner was with his brother at the time, and that the shooting occurred on the heels of a verbal exchange between Reyes and his companions and Petitioner and his companions of their respective gang affiliations. [RT at 357–61.] Reyes further testified that after the shooting, he quit "gang banging" and that he no longer associated with BLC members, [RT at 317, 366.] Reyes said he contacted Foss "because I wanted to get taken out of the gang list. That's all." [RT at 333.] The prosecutor then asked:

Q. When you say "taken out of the gang list," you want to be—you no longer associate with BLC, is that correct?

A. That's correct.

[RT at 333.]

Reyes denied that he was made any promises for his testimony and asserted that he told the truth about the October 18th park shooting incident. [RT at 333–334, 365, 377.] Reyes admitted that he was then on juvenile probation for possession of a dangerous weapon, that he told Foss that he was trying to get his nephew "Delinquent"[76]—who was then in custo-

74. The charged offenses occurred eleven days after.

75. As set out above, defense witness Sarah La Face, at whose house the party was held, contradicted much of Reyes' testimony regarding Petitioner's presence and conduct at the party, as well as the conduct of other attendees. [RT at 1168–74, 1180–88, 1191–92.]

76. Jose Reyes' nephew, Michael Reyes—"Delinquent"—was interviewed by and admitted to a defense investigator that he was present at the time of the park shooting, and that it was too dark and the shooter was too far away to be identified. He also told the inves-

dy—out of the BLC gang, and that he was loyal to (i.e. would "back up") all BLC members—including the victim—while he was active in the gang. [RT at 332–34, 370–73.] Reyes explained that it was important for him to contact Foss because someone else was using his gang moniker (name), and he did not want to be blamed for someone else's conduct. He admitted, however, that he waited several months after the shooting incident and after he purportedly became "inactive" in BLC before contacting Foss, and that he had known that another person had been using his moniker "behind his back" for at least two years. [RT at 367–69.]

On cross-examination, Reyes was even more explicit regarding his gang status:

Q. Mr. Reyes, in October 1997, how long had you been a member of the BLC gang?

. . .

A. Close to two years.

. . .

Q. And you quit the gang, you quit your active gang involvement with the gang that same month. Is that a correct statement?

A. Yes . . . .

. . .

Q. . . . So you got jumped in about two or two and half years ago. Is that a fair statement?

A. Yes, ma'am.

. . .

Q. . . . Then you left the gang in October of 1997, fair statement?

A. Yes, ma'am.

[RT at 366, 368.] Reyes subsequently referred to his gang membership in the past tense. [RT at 373 ("Anybody that was in the gang I used to be from, I considered them as my friend").]

Foss testified that Reyes' testimony factored into his opinion that Petitioner was an active gang member; that a rivalry existed between the two gangs; and that the charged offenses were committed for and on behalf of the Temple Street gang. Particularly, Foss opined that the charged offenses were committed as "a pay back, a retaliation for the incident described by Mr. Reyes[.]" [RT at 458.] Although Foss asserted that before Reyes contacted him he had received information from three or four other BLC gang members or informants about an "incident" and that there were "problems" involving Temple Street members that generally corroborated Reyes' account [RT at 442, 444, 593, 772], he admitted that the conversations with these individuals were general, that he did not document them, and that he could not recall who he had spoken to. [RT at 593–95.] Foss later testified that he had noted information received from one person identifying Petitioner as the park shooter, but admitted that the information provided was "second hand" [77] and that although he believed this conversation occurred mid to late October, his notes were not dated. [RT at 761–62, 769.]

Foss admitted that Reyes was the only person who claimed to have witnessed Petitioner commit the shooting at the park; that he had not attempted to verify Reyes'

---

tigator that Reyes was a chronic liar. This evidence was not presented to the jury. The record indicates that because he was subject to a pending petition in juvenile court, on the advice of counsel, Delinquent exercised his Fifth Amendment privilege not to testify at Petitioner's trial.

77. Foss testified that the persons he talked to were not present when the park shooting occurred and he did not know where or from whom they got their information. [RT at 769, 775.] The prosecutor's objection to defense counsel's follow-up question that, for all Foss knew, the information came from Reyes, was sustained as calling for speculation. [RT at 775.]

account; that Reyes first told him about the incident when Reyes called to remove his name from the gang list; [78] and that he had had numerous contacts with both Reyes—"in the neighborhood of three to six—and Michael Reyes ("Delinquent") in the months before and after the charged offenses. [RT at 589–91, 757, 759–61.] [79] Foss further admitted that none of the field interview cards [80] generated by local deputy sheriffs documenting "stops" of Petitioner indicated that he was in the company of known Temple Street gang members, other than his brother. [RT at 612.]

**78.** When asked on direct examination what Reyes told him when he contacted him, Foss testified:

A. He told me he wanted to be taken out of our gang file at the station. He told me that he was no longer associating with the gang BLC, and it has been several months, and in fact, he has been threatened and intimidated by other BLC members because he hadn't been hanging out or kicking it, as you refer to, with the gang members. And so they wanted to—there was talk they wanted to jump him out. He was concerned initially for his safety.

[RT at 445.] On cross, Foss confirmed that he *documented Reyes' statement that he wanted Foss to take him out of the gang files . . . because he is no longer a BLC member."* [RT at 597.]

**79.** At trial, Foss deftly avoided acknowledging that he had received information from Delinquent—who was present at the shooting—that significantly impeached Jose Reyes' identification of Petitioner as the shooter. This is evident in several exchanges during cross-examination:

Q. Have you taken steps to verify with any other person who has claimed to have been at the scene the truth or untruth of what Jose Reyes said regarding the truck shooting incident?

A. Since—since this trial?

Q. Well, since he first came to you.

A. No.

. . .

Q. Do you know the identify of any of the other people who were supposed to be at the truck on the night of the shooting?

A. As far as monikers, I am familiar with numerous monikers of BLC. The problem is that I can't—I would have to explain how we go out and we contact BLC in particular.

Q. Well—

A. They are notorious for not giving us monikers that aren't their true identities. It is very common with BLC to do this.

[RT at 759–60.]

Foss testified that he received the "disclosure" that Petitioner was the shooter at the park in the middle to end of October. He admitted the "disclosure" was given to him by someone who was not a witness, and that the information was second hand. Foss was then asked:

Q. Did anybody make any disclosures to you other than Mr. Reyes saying "I was there and I saw it"?

A. No.

[RT at 761–62.]

During re-direct examination, Foss explained why he had not initiated a police investigation on the park shooting before the spoke to Jose Reyes:

Q. Is there a reason, at least up until your conversations with Jose Reyes, that you didn't write a [report]?

A. Yes.

Q. Why is that?

A Persons I talked to were not principal witnesses, meaning that they were not physically present when this incident occurred. . . . In this particular case, I did not locate the victim, and I didn't have a principal witness. So I did not write a first report.

[RT at 769.]

Foss continued that he had, since speaking to Jose Reyes, written a report and that the park shooting was under investigation. [RT at 771.] Foss further testified that the information he received prior to talking to Jose Reyes was consistent with the information that Jose Reyes gave him. [*Id.*] He admitted that he did not know from whom his prior source—who had not witnessed the shooting—got information about it. [RT at 775.]

**80.** Foss testified that "field identification" (gang) cards are created and maintained to keep track of and record the activities and contacts of known gang members and their associates. [RT at 401–405.]

Juanita Reyes, Reyes' sister-in-law and Delinquent's mother, testified during the defense case that Reyes' reputation within the family for truth and honesty is "not real good" and that "he lies a lot." [RT at 1157.]

During closing argument, the prosecutor pointedly argued that Reyes' testimony—that Petitioner was the shooter, eleven days earlier, against rival gang members—constituted "other crimes" which established that Petitioner and his brother agreed, intended, and wanted to kill the victim. [RT at 1465–66, 1468–70.] Particularly, the prosecutor argued:

> You heard Jose Reyes. He's the one who testified about that particular incident ... [the] evidence of other crimes ... the same gang, same rival gang, same weapon, same M.O. [modus operandi] ... How this defendant does things. How this defendant and his brother do things. How members of Temple Street do things. The same M.O. eleven days earlier. The only difference being this defendant was the shooter. It was his turn that day, and there was another driver ... [¶] That's how you get to agreement and intent. That's how you get to what is going on in this defendant's mind when he was driving that car on October 29, 1997."

[RT at 1469.]

The prosecutor further argued that Reyes had "no reason to lie" [RT at 1475–76]; that "there has been nothing showing that he had a reason to lie. That he had a motive. That he had a bias.... [¶] Jose Reyes is or was a gang member. Was a gang member. I think is probably more accurate. That is what his testimony was." [RT at 1477.] The prosecutor contended that the fact that Reyes was considered to be dishonest by family members was hardly surprising in context, and that there was no evidence that Reyes received anything in exchange for his testimony. [RT at 1476–78.] As with Hewitt's testimony, the prosecutor argued that Petitioner—not Reyes—was a liar. [RT at 1480, 1495.] On rebuttal argument, the prosecutor chided the defense's claim that Reyes was "backing up" Zuniga because of their joint affiliation with BLC. [RT at 1578.]

The state appellate court rejected Petitioner's challenge to Reyes' testimony, stating that—with apparent reference to Hewitt's testimony—"[l]ikewise, the testimony of Mr. Reyes, even if partially false, was not material to [Petitioner's] guilt or innocence, nor is there a reasonable probability that it affected the outcome in this case." [Lodg. No. 14 at 2.]

b). *False testimony*

Petitioner first contends that Reyes falsely testified at trial that he was no longer a gang member and that he left the gang in October, 1997, after the park shooting incident, and that the prosecution knew this testimony was false. The state appellate court appears to have assumed the truth of these allegations in rejecting Petitioner's claim. This court goes one step further and concludes that Petitioner has established by clear and convincing evidence that the challenged testimony was false, and that the prosecution knew, or should have, so known.

In support of the instant petition and his habeas petition filed in the California Supreme Court, Petitioner submitted a copy of a sheriff's gang field identification card dated November 26, 1997, made out in the name of Jose Narciso Reyes, indicating membership in BLC, and the moniker "Moreno." [Lodg. No. 15, Ex. L; Pet., Ex. L.] Petitioner also submitted a transcript of a change of plea hearing on April 30, 1999, in Los Angeles Superior Court (Lancaster), at which hearing Jose Narciso Reyes entered a no contest plea to assault with a deadly weapon and admitted as true

the elements of a charged gang enhancement, including that his moniker was "Moreno" and that he was a member of BLC. [Lodg. No. 15, Ex. M at 2, 9; Pet., Ex. M at 2, 9.] In addition to these documents, Petitioner has submitted a copy of a complaint report dated October 18, 1997 charging Jose Reyes and another individual with vandalism, and a related supplemental report documenting the execution of a search warrant by sheriff deputies at Jose Reyes' residence on November 26, 1997. [MER, Ex. 5.][81] These documents, the latter of which indicates that gang graffiti, a crossbow and ammunition were found in Reyes' bedroom, were obtained by Petitioner during the course of federal proceedings pursuant to subpoena. [MER, Declaration of Tracy J. Dressner at ¶ 3.][82]

These materials, as well as the record as a whole, persuade the court that Reyes falsely testified that he quit BLC in October, 1997, and that, at the least, the prosecution should have known that this testimony was false. The clearest (though not exclusive) evidence of this is Reyes' own admission to Foss' colleague, Deputy McPolin, on November 26, 1997. In the supplemental report documenting the execution of the search warrant at Reyes' residence, McPolin reports that "I spoke to ... Reyes and he admitted to belonging to the gang BLC and having a moniker of Moreno." [MER, Ex. 5.] McPolin further reports that during that search, three rounds of .22 caliber ammunition, a crossbow, graffiti and other gang paraphernalia—were recovered from Reyes' bedroom. [*Id.*] The physical evidence opined by Foss to be indicative of Petitioner's active gang membership pales in comparison to discovery of a weapon and ammunition, along with other indicia of gang membership, found in Reyes' bedroom about six weeks after Reyes purportedly "quit" BLC. The close proximity in time between the discovery of this evidence by sheriff deputies (prompted by and on the heel of Reyes' arrest for gang graffiti) and the date of the park shooting, as well as the nature of the evidence itself, renders Reyes' denial incredible, and knowingly so. Other evidence within the purview of the prosecution, including the fact that Foss—a gang investigator—had several contacts with Reyes in the months before and after the charged offenses and that Reyes was docu-

81. There is no dispute that the person identified as "Jose Reyes" in each of these documents and the "Jose Reyes" who testified at Petitioner's trial are one and the same person.

82. Preliminary to addressing the import of these materials, the court notes, and rejects, Respondent's renewed contention that the court erroneously granted Petitioner's motion to expand the record to include them. [*See* Resp. PEHB at 22–24; Order dated September 15, 2008 (granting motion to expand the record).] As before, Respondent asserts that they are irrelevant except for the impermissible purpose of attacking Reyes' character for truthfulness or to establish a prior conviction under Rules 608 and 609, respectively, of the Federal Rules of Evidence. In short, Respondent insists that these materials are offered in a veiled attempt to re-weigh Reyes' credibility at trial.

Respondent is mistaken. These materials— as well as the items relating to Delinquent, to which Respondent similarly objected and continues to object [*see* Resp. PEHB at 24–25]— were neither offered nor allowed for purpose of showing Reyes' propensity to lie or to attack his character for truthfulness. Indeed, as Respondent correctly points out, the jury heard evidence that Reyes was a known liar. [Resp. PEHB at 22.] Rather, the court has allowed, and considered, these materials for the purpose and to the extent that they are relevant to or tend to establish the first two elements of Petitioner's *Napue* claim regarding Reyes' testimony; namely, that Reyes falsely testified at Petitioner's trial—that he quit BLC after the park shooting in October, 1997 and that Petitioner was the shooter in the park incident—and that Respondent knew, or should have known, that his testimony in both regards was false.

mented as a BLC member in a field identification card on November 26, 1997,[83] further supports this conclusion.

Petitioner also contends that Reyes falsely testified that Petitioner was the park shooter. In support, Petitioner cites, and the court has considered, Delinquent's sworn statement to the defense investigator regarding, among other things, the park shooting and, in particular, impeaching Jose Reyes' identification of Petitioner as the shooter. [*See* MER, Ex. 4.] As a foundational matter, there is no dispute that Delinquent was with Jose Reyes at the park at the time of the shooting. The statement reflects initialed corrections, and indicates that it was signed by Michael Reyes ("Delinquent") under penalty of perjury. It bears no indicia that it was other than freely and voluntarily given, nor that it is other than what it purports to be. Although never subjected to cross-examination, there does not appear to be any serious dispute to these foundational considerations in the record. Additionally, there is no indication in the record that Foss, who stated he had had several contacts with both, had particular reason to find Jose Reyes more credible than Delinquent.

While Delinquent's statement is insufficient in and of itself to prove that Reyes' lied about Petitioner's presence at the park, it more than sufficed to put the prosecution on notice of a real possibility that Jose Reyes' "signature offense" testimony was false.

Any doubt to this effect was laid to rest at the evidentiary hearing. At the evidentiary hearing, Foss testified that he spoke to Delinquent during Petitioner's trial about the park shooting and that Delinquent told him then that although he and the other BLC members present suspected Temple Street was behind the shooting, it was too dark to identify the shooter.[84] Foss was fairly certain at the evidentiary hearing that he informed the prosecutor of the substance of his conversation with Delinquent. [EHT at 70–71.]

The court finds this revelation troubling not only because it was previously unknown to Petitioner [*see* Pet. PEHB at 26] and surfaced at this late juncture in the proceedings, but because it corroborates Delinquent's statement to the defense investigator (which evidence Petitioner was unable to present to the jury), and because after independently obtaining this corroboration, the prosecution appears to have ignored it. As Foss testified on cross-examination at trial:

> Q. Have you taken steps to verify with any other person who has claimed to have been at the scene the truth or untruth of what Jose Reyes said

---

83. In this regard, it bears repeating, as Foss testified on direct examination at Petitioner's trial [RT at 401–05], and at the evidentiary hearing [EHT at 23–24], field identification cards are created and maintained to keep track of and record the activities and contacts of known—admitted—gang members and their associates.

84. Respondent argues that Delinquent' statement is not favorable to Petitioner because he believed the attackers were from Temple Street, but he could not identify the shooter. [Resp. PEHB at 34.] This argument reflects a fundamental misunderstanding of the evidence and its import. Delinquent's belief is hardly surprising in light of the fist fights involving members of both gangs that preceded the shooting. Yet, the evidence is undisputed that Petitioner did not participate in those fights. Moreover, Delinquent could not make an identification because—as he put it—it was too dark to do so. If it was too dark for him to identify the shooter, it is reasonable to assume that it was too dark for those with him—i.e. Jose Reyes—to make an identification. *A fortiori*, Delinquent's statement is patently favorable to Petitioner, and its impeachment value far from negligible.

regarding the truck [park] shooting incident?

A. Since—since this trial?

Q. Well, since he first came to you.

A. No.

[RT at 759–60.][85]

■ The court is mindful that the prosecution's knowledge of inconsistent evidence does not necessarily demonstrate knowing use of false testimony. *See e.g. United States v. Geston,* 299 F.3d 1130, 1135 (9th Cir.2002). However, a prosecutor's duty under *Napue* to correct false evidence and elicit the truth "requires [him] to act when put on notice of the real possibility of false testimony. This duty is not discharged by attempting to finesse the problem by pressing ahead without a good faith attempt to resolve it." *Commonwealth of Northern Mariana Islands v. Bowie,* 243 F.3d 1109, 1118 (9th Cir.2001). Nor can "[a] prosecutor . . . avoid this obligation by refusing to search for the truth and remaining ignorant of the facts." *Morris v. Ylst,* 447 F.3d 735, 744 (9th Cir.2006) (*quoting Bowie,* 243 F.3d at 1118).

The court finds that the prosecution breached its duty under *Napue* with respect to Jose Reyes' "signature offense" testimony. The record developed to date evidences that the prosecution had abundant reason to question Jose Reyes' veracity and identification of Petitioner as the park shooter. Although "put on notice of the real possibility" that the testimony was false, the prosecution "press[ed] ahead without a diligent and good faith attempt to resolve it." *Bowie,* 243 F.3d at 1118.

Additionally, Foss' revelation at the evidentiary hearing places his trial testimony

as to the "percipient" information he had regarding the park shooting in a demonstrably different light. As noted above, Foss testified at trial that he received second hand information implicating Petitioner in the shooting before he spoke to Reyes, but that Reyes was the first, and only percipient witness, to identify Petitioner as the shooter. His testimony to this effect was clear:

Q. Did anybody make any disclosures to you other than [Jose] Reyes saying "I was there and I saw it?"

A. No.

[RT at 762.] As is now readily apparent, the clear inference at trial that only Reyes provided percipient information to Foss about the shooting is unfounded because false. Moreover, it remained uncorrected. That the jury was misled in this way—as well as Foss' evident willingness to embrace Jose Reyes' identification in spite of equally percipient evidence which indicated its unreliability—further shakes, as set out below, the court's confidence in the fairness and outcome of Petitioner's trial.

#### c). *Materiality*

As previously stated, the state appellate court rejected Petitioner's claim, concluding that "the testimony of Mr. Reyes, even if partially false, was not material to [Petitioner's] guilt or innocence, nor is there a reasonable probability that it affected the outcome in this case." [Lodg. No. 14 at 2.] As with Hewitt's testimony, the state appellate court's summary conclusion that Reyes' testimony was immaterial to the jury's determination is unsupportable in light of the evidence and

---

**85.** Indeed, when asked whether he knew the identity of any of the other people who were supposed to be present at the park shooting, Foss responded: "As far as monikers, I am familiar with numerous monikers of BLC" but that BLC members are "notorious for giving monikers that are not their true identities." [RT at 760.] Yet, Foss knew from his own contact with Delinquent that Delinquent had been present. Moreover, it is clear from the record that Foss had no question as to Delinquent's identity. [*See* RT at 589–91.]

argument presented at trial. Reyes' testimony that Petitioner shot at him and other BLC members eleven days before the charged offenses, which was not corroborated by any other witness, effectively portrayed Petitioner as presently and actively engaged in violent, armed gang activity with his brother, thereby setting the stage, and providing the context, for Petitioner's actions and conduct at the time of the charged offenses. Reyes' testimony indisputably bolstered the prosecution's less than compelling circumstantial proof on the contested issues of whether Petitioner knew that his brother was armed and shared in his intent.

One need look no further than the prosecutor's closing argument to appreciate the full measure of Reyes' testimony to the prosecution's case. As with Hewitt's testimony, the prosecutor pointedly, and repeatedly, argued that Reyes' "signature offense" testimony—that Petitioner was the shooter, eleven days earlier, in an incident targeting BLC members—was sufficient in and of itself to raise the inference that Petitioner agreed, intended, and wanted to kill Zuniga. [RT at 1465–66, 1468–70.] In short, "[t]he importance of [Reyes'] testimony was underscored by the prosecution [itself] in its closing argument." *Hayes,* 399 F.3d at 986. As already observed, the word of the prosecutor is the best indicator of the likely damage inflicted by the false evidence. *See Kyles,* 514 U.S. at 444, 115 S.Ct. 1555; *Horton,* 408 F.3d at 579–80.[86]

Additionally, the record refutes Respondent's argument that Reyes' false testimony regarding his gang status was immaterial because irrelevant except to the extent it bore on his credibility. [Resp. PEHB at 22–23.] As a preliminary matter, "[t]hat the false evidence presented by the State dealt only with credibility does not change the materiality calculus." *Hayes,* 399 F.3d at 986. Moreover, the record evidences that Reyes' false testimony regarding his gang status was not immaterial in context.

An evident theme in the prosecution's case was that members and associates of an established gang are unfailingly loyal to, and biased in favor of, each other—i.e., they "back up" each other—often irrespective of their affiliation with a particular clique. This theme surfaced as both a prosecutorial sword and a shield. For example, the prosecutor discounted defense witness Sarah La Face (who countered Reyes' account of the party preceding the park shooting) as biased because she "hangs out with Temple Streeters." [RT at 1578.] On the other hand, the prosecutor argued that Reyes—who claimed to have abandoned his gang ties—exhibited no such bias. [RT at 1477.]

The apparent inference sought to be drawn from this argument was that current gang ties render one inherently biased, and therefore not credible, whereas past gang ties carry no such stigma. Reyes' testimony permitted the prosecution to portray Reyes as not so stigmatized, as well as to indulge the impression that Reyes was testifying merely to clear his "good name" and for no other particular reason. Revelation that Reyes lied about his gang status would have nullified these positive attributes and placed him in the same category of witnesses asserted by the prosecution to be inherently biased. At the least, the prosecution would have

**86.** Petitioner argues that Reyes' testimony was also material to Foss' expert opinion that the charged offenses were "payback" or in retaliation to the park shooting, and hence, the charged offenses were, in sum, gang-related. However, evidence independent of Reyes' testimony supports Foss' opinion, including the aftermath of the party at Sarah La Face's house, and the cross-out graffiti. Although not overwhelming, this corroboration suffices to overcome the taint of Reyes' testimony—as to this contention—for *Napue* purposes.

been deprived of the ability to distinguish Reyes and bolster his credibility on that basis, as well as cast doubt on the prosecution's embrace of his testimony. On a more practical note, as the jury was instructed—and the prosecutor urged in attacking Petitioner's credibility—proof that Reyes lied about one fact, i.e., his gang status, would have permitted the jury to disbelieve the whole of his testimony.

As discussed, Petitioner denied that he knew that his brother was armed, or that he shared his brother's intent to shoot Zuniga. As to these pivotal issues, the prosecution argued that Reyes' testimony—placing a firearm in Petitioner's possession under circumstances nearly indistinguishable from, and only days before, the charged offenses—was sufficient, in and of itself, to show that Petitioner agreed and intended to murder Zuniga. The prosecutor further urged the jury to credit Reyes—who was purportedly reformed and unbiased—and to conclude, in comparison, that Petitioner was a liar. Thus, Reyes' testimony served the dual and critical prosecutorial purposes of filling a void in the otherwise circumstantial proof of intent and knowledge, as well as to impeach Petitioner's denials and credibility.

*Napue* directs that false testimony is material if there exists any reasonable likelihood that the false testimony *could* have affected the judgment of the jury. That standard is met here. The state appellate court's rejection of Petitioner's claim based on an assessment of otherwise sufficient evidence to convict, and in particular, so-called "overwhelming" evidence of Petitioner's gang membership, to the apparent exclusion of record evidence supporting Petitioner's claim and demonstrating the intended and actual use by the

prosecution of Reyes' testimony—the full measure of which was succinctly articulated during the prosecution's closing argument—constitutes an objectively unreasonable application of *Napue* on the law and the facts. 28 U.S.C. § 2254(d). Reyes' false testimony was material, undermining the fairness of the trial and confidence in the verdict.

### 5. *Foss*

Petitioner contends that Foss falsely testified at trial that in October 1997, before the charged offenses occurred, he observed "cross-out" graffiti on the inside walls of an abandoned residence, which graffiti was depicted in three photographs he took during the trial. [Pet. at 35.][87] Petitioner also contends—based on evidence which developed during the evidentiary hearing—that Foss falsely testified at trial that he had no eyewitness information regarding the park shooting other than that from Jose Reyes. [Pet. PEHB at 26.]

#### a). *Pertinent background*

Midtrial, on May 7, defense counsel informed the trial court that the prosecutor "approached me yesterday and showed me photographs of graffiti from a case arising in November, 1997, where Detective Foss arrested an alleged BLC member who was marking over Temple Street graffiti" and that she was told she would be given a report of that arrest that day. [RT at 241.] In response to defense counsel's complaint as to the timing of this discovery, the prosecutor represented that the arrest arose out of an incident that "happened in November that's not related to [Petitioner] other than Detective Foss will be relying on that incident; relying on some observation he made of crossed out

---

**87.** Related to this, the Petition also alleges that Foss falsely testified at trial that he did not take photographs of the cross-out graffiti

until Petitioner's trial was in progress. [Pet. at 35.] For the reasons discussed below, the court rejects this specific allegation.

gang names to show that there was a rivalry" between the two gangs. [RT at 241–42.] The prosecutor further represented that "Detective Foss, just because I think he's a thorough detective, went out, I think yesterday, just to see if the writing was still there, and took some photographs." [RT at 242.] Defense counsel objected, stating that the arrest report had not yet been turned over, and that Foss waited until trial to produce "physical evidence" that was apparently obtainable by him months before. [RT at 243.] The prosecutor responded that "we didn't even do the photographs. Detective Foss went out and took them." [RT at 243.] The trial court overruled the defense's objection to the late discovery, stating that "what's in [Foss'] mind is in his mind. He then developed it to the point where it is physically in a physical representation form of photographs." [RT at 243–44.]

On direct examination, Foss identified and described three photographs depicting Temple Street and BLC gang graffiti on an interior wall of an abandoned house. Foss testified that the photographs showed Temple Street graffiti which had been marked over or crossed out with BLC graffiti, indicating disrespect of the Temple Street gang and a challenge to their claimed territory.[88] Foss opined that such graffiti leads to confrontations and was indicative of a rivalry between the two gangs. Foss testified that although he did not take the photographs until midtrial, the photographs accurately depicted cross-out graffiti he had observed in October of 1997 before the charged offenses occurred. [RT at 574–78.][89]

**88.** Foss described the three photographs, identified as People's Exhibits 20, 21 and 22, as follows:

A. These three photographs show Temple Street graffiti marked on a wall inside a residence. Temple Street is written—a roster of gang names is written.

. . .

People's 22 shows Temple Street in rather large gang-style writing. "213 L. A." is written on there and there is a series of names below Temple Street. Some of them. "Solo. Monster. Bosco." is written on that. On People's 21 there is another angle inside the same residence. It shows, again, "213." "Temple Street." It's crossed out in black markings. "BLC"—"BLC Times Three" is written above the top of People's 21. It also shows "VTR" in gang-style writing. People's 20, again, it is the same residence. The same room. "Temple Street" is written. It's crossed out in black marking. "BLC" is written over the top of it. "213" is written there, and a moniker of "Monster" is at the bottom of this picture. [RT at 575.]

**89.** On direct examination at trial, Foss testified as follows:

Q. When did you first observe the writing depicted in People's 20, 21 and 22?

A. I first . . . saw just the Temple Street markings minus the BLC markings. It was either late September or the first week of October.

. . .

Q. Did you observe some writings later on?

A. Within several days of that, I noticed the Temple Street was crossed out, or x'd out.

Q. Did you, again, have an occasion to make some observations of that writing?

A. Yes. I was, again, in this residence and observed some other BLC markings. That would have been late November, early December, somewhere in there, possibly even later than that.

Q. Prior to that time being in there, however, you had observed the Temple Street crossed out, apparently by members of BLC—

A. Yes.

Q. . . . Now, when you observed that, the crossing out for the first time, would that have been prior to the shooting that occurred on October 29, 1997?

A. Yes it was.

Q. Now, just so we're clear, when did you take those photographs?

A. These photographs were taken on May 5, 1998.

Q. So that was just a few days ago?

A. Yes.

Q. . . . And to the best of your recollection the walls appeared to be in a similar state as when you made the observations in October, is that correct?

On cross-examination, Foss admitted that the word "Delinquent" appeared as crossing out Temple Street graffiti in one photo, and that he had detained (arrested) "Delinquent"—Jose Reyes' nephew—for "this graffiti." [RT at 579–80.][90] Foss was not asked, nor did he volunteer, the date he had detained Delinquent; that he took photographs of graffiti at the same location after detaining Delinquent; and that Delinquent confessed to doing tagging at the location the previous November (1997). [Pet., Ex. O; MER, Ex. 3.] The photographs taken by Foss mid-trial were admitted into evidence, and argued as indicia that a rivalry existed between the two gangs at the time of the charged offenses.

As set out above, at the evidentiary hearing, Foss reiterated his trial testimony that the photographs he took midtrial depicted graffiti which he had observed before the charged offenses. [EHT at 44–46.]

It is undisputed that the photographs taken by Foss in January, 1998, in connection with Delinquent's arrest no longer exist. [See MER, Declaration of Tracy J. Dressner; EHT at 45.] Petitioner has submitted photocopies of the photographs taken midtrial by Foss and admitted at Petitioner's trial. [MER, Ex. 7.]

### b). State court decision

The state appellate court rejected Petitioner's claim that Foss' testimony was "suspect" because "inconsistent on the is-sue of whether he had taken Polaroid pictures of certain graffiti being crossed out, indicating a gang rivalry[,]" stating that "[Petitioner] has failed to demonstrate that the inconsistent testimony was deliberately false, much less that it was substantially material to his guilt and undermined the entire outcome of the case." [Lodg. No. 14 at 2.]

Respondent goes further, arguing that Petitioner has not, in any event, established a factual basis that Foss' trial testimony was inconsistent with other evidence known to him, and therefore, false. [Resp. PEHB at 26–27.]

### c). False testimony

Certain facts relevant to Petitioner's claim are undisputed. First, the photographs taken by Foss during Petitioner's trial (in May, 1998) depict cross-out graffiti observed by Foss inside a vacant house. Foss did not specify where within the house (i.e., what room or rooms) he took these photographs. [RT at 575–78.] The graffiti at the location—a two story, multi-room residence—was pervasive, on-going and multilayered. [EHT at 45.]

Second, Foss took photographs of graffiti at the same vacant house several months before, in January, 1998, in connection with a vandalism complaint he submitted against Delinquent. The complaint report states that Foss saw gang style graffiti depicting "BLC" and "Delinquent" tagged

---

A. Yes. The only difference I would note would be on People's 22. I recognize the same markings. The x'ing out. It looks like there is another moniker marked out in the same black that is crossing—it looks like it's crossing out Temple Street, which it appears to be part of 'Delinquent,' which is a moniker from somebody from BLC. [RT at 577–78.]

90. Specifically, Foss reported that he observed "gang style graffiti inside all of the upstairs bedrooms in black writing depicting the gang "BLC" with the moniker of Delin-quent" and that Foss took "several polaroid photo's of the graffiti inside the location, [which] photos will be kept in the investigative file." In a supplemental report of an interview with Delinquent, Foss told Delinquent that he "saw his moniker and gang tagged in several rooms inside the vacated house." Delinquent "admitted to doing all of this tagging because "Temple Street" was tagged inside" and "Temple Street and BLC do not get along." Delinquent told Foss that he tagged the house "sometime in mid November." [See MER, Ex. 3.]

inside all of the upstairs bedrooms, and that he took several photographs "of the graffiti inside the location." [Ex. 3 to MER; Pet., Ex. O.] In a supplemental report, Foss states that he told Delinquent that he saw his moniker and gang tagging in several rooms at the vacant house, and that Delinquent "admitted to doing all of this tagging because 'Temple Street' was tagged inside" and "Temple Street and BLC do not get along." Delinquent told Foss that he tagged the house in mid-November (1997). [*Id.*]

Third, one of the three photographs admitted at Petitioner's trial—People's 22—depicts "Delinquent" written near a cross-out of Temple Street. [RT at 579; EHT at 48.] Foss testified on cross examination at trial that in this photograph, " 'Temple Street' is clearly marked out in black marker, and 'BLC times three' is written right in the middle of 'Temple Street.' " Defense counsel asked:

Q. And the photograph you just reviewed [People's 22] showed the name Delinquent on it. You actually arrested a gentleman by the name of Delinquent for this graffiti, correct?

A. I detained a juvenile [named Delinquent], yes,

[RT at 578.]

Finally, the photographs Foss took in January, 1998 no longer exist, accordingly, they cannot be compared to the photographs admitted at Petitioner's trial to determine whether, in fact, they depict the same graffiti.

Beyond this, the record is less than conclusive. As the court previously indicated, a reasonable inference can be drawn from Delinquent's admissions that he was responsible for the cross-out graffiti photographed mid-trial by Foss [*See* Order re Further Proceedings]; this inference is supported by People's 22 [MER, Ex. 7], which also depicts Delinquent's moniker.

On the other hand, Foss testified at the evidentiary hearing that, regardless of when Delinquent said he did the tagging, he first saw Delinquent's moniker in January, 1998. [EHT at 50–51.] His report indicates that he saw that moniker in the upstairs bedrooms. In comparison, there is no indication in the record whether this was the same area or rooms Foss photographed during the trial. Thus, the court cannot find based on the record as it presently stands that no cross-out graffiti was present in the vacant house before Delinquent tagged it in mid-November.

As Petitioner points out, the fact that Foss made no apparent effort to document the cross-out graffiti until mid-trial is somewhat incredulous given its clear import to the prosecution's case. [*See* Pet. PEHB at 26; EHT at 51.] However, the fact that Foss did not photograph the cross-out graffiti he observed in October 1997 until May 1998, in the middle of trial, was known to the jury. Moreover, the court cannot say that Foss' explanation in this regard, which he testified to at the evidentiary hearing [EHT at 31–33; 42–44, 48–49, 51] is so farfetched as to render wholly incredible his further evidentiary hearing testimony that the photographs he took in January were different than the ones he took during Petitioner's trial. [EHT at 45–48.] In light of this, whatever inconsistencies or ambiguities might exist in the record regarding Foss' testimony as to the origins of the cross-out graffiti are insufficient to meet *Napue*'s standard for falsity.

Although Petitioner's *Napue* claim fails on this basis, as discussed above, Foss admitted at the evidentiary hearing that he spoke to Delinquent during Petitioner's trial about the park shooting. [EHT at 60.] Based on that admission, which surfaced for the first time at the evidentiary hearing, the court finds, for purposes of

*Napue*, that Foss falsely testified at trial that the only percipient information he had regarding the park shooting came from Jose Reyes. [*See* RT at 762.]

#### d). *Materiality*

■ The court further finds that Foss' false testimony was material. As discussed above, Jose Reyes' identification of Petitioner as the park shooter figured prominently in the prosecution's case-in-chief. Foss' false testimony that no other witness other than Jose Reyes told him that he was present and witnessed the park shooting [RT at 762] allowed Jose Reyes' uncorroborated account to remain unrebutted. In fact, as Foss well knew, Delinquent was present at the park shooting and his account cast considerable doubt on the reliability of Reyes' identification.

Additionally, Foss testified at trial that he relied on Jose Reyes' account of the park shooting in forming his opinion regarding Petitioner's gang status at the time of the offense, as well as that the charged offenses were in retaliation for the park shooting. Foss' false testimony is no less material simply because, as he testified at the evidentiary hearing, his opinion as to Petitioner's gang status, and that there was a rivalry between the two gangs, remains unchanged without resort to Jose Reyes' testimony.

As discussed above, the evidence of Petitioner's gang membership and of the budding rivalry between the two gangs hardly compels the conclusion that Petitioner knew his brother was armed, and that the two of them planned and intended to commit murder. For all of these reasons, Foss' false testimony was not immaterial in context, and further undermines the court's confidence in the verdict.

#### 6. *Conclusion*

Petitioner has established that Hewitt, Reyes and Foss each testified falsely at trial, that the prosecution knew that the testimony was false, and that the false testimony was material under *Napue*. Considering the *Napue* violations collectively, the court concludes that there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392; *Hayes* 399 F.3d at 985. Stated differently, the violations, individually and collectively, undermine confidence in the verdict. *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. The state appellate court's determination to the contrary constitutes an unreasonable application of *Napue* on the law and the facts. 28 U.S.C. § 2254(d). Habeas relief is thus warranted on this ground.

### B. *Suppression of material exculpatory and/or impeachment evidence*

In Claim Two, Petitioner contends that the prosecution failed to disclose material impeachment evidence before (and after) trial relating to Hewitt, Jose Reyes, and Foss., in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). [Petition at 13, 39–40.]

Specifically, with respect to Hewitt, Petitioner alleges that the prosecution failed to disclose: (1) the 1993 LAPD sustained Complaint against Hewitt for lying [Pet. at 19; Pet. Ex. E]; (2) a 1997 memorandum by then DDA Steve Giedzinski to his supervisor that certain CRASH officers falsely reported that a field show up was conducted resulting in identification of the defendant, which false information was included in a probable cause declaration executed by Hewitt [Pet. at 19–20; Pet., Ex. G], and (3) evidence which documented Hewitt's misconduct, including that:

—Hewitt was relieved of duty by the LAPD on August 31, 1998 as a result of alleged misconduct (under investigation at the time of Petitioner's trial) in a certain case, including, among other things, planting evidence and falsifying

reports. As a result of these, and other sustained allegations, Hewitt was fired by the LAPD on March 27, 1999. [Pet. at 17–20],[91] and—Before the conclusion of Petitioner's direct appeal, the LAPD and prosecuting authorities became aware of numerous additional instances of misconduct committed by Hewitt— before and after his testimony in Petitioner's trial—which are indicative of Hewitt's untrustworthiness and propensity to falsify reports and plant evidence. [Pet. at 20–21.]

[Pet. PEHB at 50–51.]

With respect to Jose Reyes, Petitioner alleges that the prosecution failed to disclose the "Jose Reyes" field identification gang card dated November 26, 1997 [Pet. at 28; Pet., Ex. L], as well as the Complaint report of Reyes' October, 1997 arrest for vandalism, and supplemental report regarding the search of his residence in November, 1997. [Pet. PEHB at 51; MER, Ex. 5.]

With respect to Foss, Petitioner alleges that the prosecution failed to disclose the photographs referenced in Foss' January, 1998, graffiti complaint report against Delinquent. [Pet. at 34–36.] With respect to both Reyes and Foss, Petitioner further alleges that the prosecution failed to disclose Foss' written documentation of his conversation with Delinquent that he was present at the park shooting and that it was too dark to identify the shooter. [Pet. PEHB at 53.]

### 1. *Background*

With the exception of the police reports of Reyes' arrest and the subsequent search of his residence in October, and November, 1997, respectively [MER, Ex. 5] and documentation of Foss' conversation with Delinquent during Petitioner's trial [EHT

at 60, 70–71], both of which were discovered in connection with the evidentiary hearing in this court, Petitioner alleged in the California Supreme Court that the prosecution's failure to disclose the above materials violated *Brady*. [*See* Lodg. No. 15 at 15–19, 26, 35–37.] As noted, that Court issued a summary denial of Petitioner's claims.

The state appellate court, in turn, rejected Petitioner's *Brady* claim raised in that court as follows:

> [Petitioner] contends ... [that] the prosecution withheld exculpatory evidence concerning misconduct by former Officer Hewitt in violation of *Brady v. Maryland* (1963) 373 U.S. 83, 87 [83 S.Ct. 1194, 10 L.Ed.2d 215] and its progeny[.]
>
> ....
>
> [¶]
>
> ... [T]he evidence of former Officer Hewitt's misconduct that was not provided was not 'material' for purposes of *Brady v. Maryland, supra,* 373 U.S. at page 87 [83 S.Ct. 1194]. The United States Supreme Court has defined materiality for *Brady* purposes: 'The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' (*United States v. Bagley, supra,* 473 U.S. at p. 682 [105 S.Ct. 3375]; *see Kyles v. Whitley* (1995) 514 U.S. 419, 433–434 [115 S.Ct. 1555, 131 L.Ed.2d 490].) Given the state of the evidence, without disclosure of former Officer Hewitt's background, there is no reasonable probability that had that information been disclosed the result would have been any different. Prior to the shooting in this case, [Petitioner] was involved in a shooting with another gang on October

---

**91.** As already noted, Petitioner was convicted on June 9, 1998 and sentenced on September 9, 1998. Petitioner's conviction did not become final until denial of review by the California Supreme Court on May 17, 2000.

19, 1997. [Petitioner's] half-brother was Michael Blumberg. [Petitioner] admitted driving Mr. Blumberg, who fired the fatal shots, to the scene of the shooting and to safety afterwards. [Petitioner] admitted harboring Mr. Blumberg after the shooting. Defense evidence indicated: [Petitioner] was expelled from Little Rock High School in 1993 for fighting; in 1994, [Petitioner] dropped out of Palmdale High School; [Petitioner] admitted joining the gang in early 1994; [Petitioner's] moniker within the gang was "Whisper"; [Petitioner's] half-brother, Mr. Blumberg, was also a member of the gang; [Petitioner] lied about his whereabouts at the time of the shooting when he was arrested; and both [Petitioner] and Mr. Blumberg at the time of the shooting still had friends in the gang. Other testimony indicated: at the time of the shooting, [Petitioner] was wearing gang attire; when taken into custody, [Petitioner's] chrome belt buckle had the initials of the gang; [Petitioner's] head was clean shaven when he was apprehended in a manner typical of gang members; when arrested, [Petitioner] had gang tattoos on his forearm and back; the tattoo on his back consisted of the gang name in large letters; the jury had before it a photograph of [Petitioner] flashing a gang sign; while incarcerated, [Petitioner] had in his possession a state prison gang's "hit list"; and [Petitioner] failed to comply with a court order to appear at a lineup with his head clean shaven as it was when he was arrested. Finally, much of the evidence demonstrating [Petitioner] was a gang member was physical evidence.

[Lodg. No. 12 at 2–3.]

## 2. *Federal standard*

■ Under clearly established Supreme Court law, suppression by the prosecution, whether purposeful or inadvertent, of evidence favorable to an accused violates due process "where the evidence is material to either guilt or punishment[.]" *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), *quoting Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Evidence is "material" for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), *quoting United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir.2008). Meeting this standard does not require a demonstration that disclosure of the suppressed evidence would more likely than not have resulted in a different outcome. *Jackson*, 513 F.3d at 1071 (*citing Kyles*, 514 U.S. at 434, 115 S.Ct. 1555). Moreover, a "reasonable probability" may be found "even where the remaining evidence would have been sufficient to convict the [petitioner]." *Jackson*, 513 F.3d at 1071 (*citing Strickler*, 527 U.S. at 290, 119 S.Ct. 1936); *accord Kyles*, 514 U.S. at 434–35, 115 S.Ct. 1555 ("materiality . . . is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough to convict"). Rather, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555 (*quoting Bagley*, 473 U.S. at 678, 105 S.Ct. 3375). "*Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict

with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. In making this determination, the suppressed evidence is considered collectively, rather than item by item. *Id.,* at 436, 115 S.Ct. 1555.

 The government's duty of disclosure under *Brady* applies equally to exculpatory and impeaching evidence, *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375 (evidence undermining the credibility of a state's witness is "evidence favorable to an accused, . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal" (internal quotation marks and citation omitted)), and exists whether or not a specific request for disclosure has been made by the accused. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The duty of disclosure further "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler,* 527 U.S. at 280–81, 119 S.Ct. 1936 (*quoting Kyles,* 514 U.S. at 438, 115 S.Ct. 1555); *Jackson,* 513 F.3d at 1072 ("The Supreme Court has made abundantly clear . . . that the prosecutor's duty to disclose evidence favorable to the accused extends to information known only to the

police" (*citing Kyles,* 514 U.S. at 438, 115 S.Ct. 1555)). The prosecution's duty under *Brady* is a continuing one that extends through habeas proceedings. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *Thomas v. Goldsmith,* 979 F.2d 746, 749–50 (9th Cir. 1992).

### 3. *Discussion*

 Following the above authority, the court concludes that the all of the itemized evidence relating to Hewitt, and Reyes, as well as Foss' interview of Delinquent,[92] constitute impeachment and/or exculpatory evidence which the prosecution had a duty to disclose pursuant to *Brady,* and its progeny.[93]

Further, the itemized evidence considered collectively was material under the federal standard. As noted above, whether Petitioner knew that his brother was armed and shared his brother's intent at the time of the shooting were the primary issues at trial. On these pivotal issues, the record is clear that Foss, Reyes, and Hewitt were critical witnesses for the prosecution. No other witness corroborated Reyes' crucial testimony that Petitioner—accompanied by his brother—shot at Reyes and other BLC gang members at

---

**92.** Respondent disputes any obligation to "turn over" Foss' conversation with Delinquent. [Resp. PEHB at 34.] Respondent's apparent claim is that *Brady* does not obligate the prosecution to open its files to Petitioner, nor to disclose all of its investigative work or work product. This contention, while true, *see Bagley,* 473 U.S. at 675, 105 S.Ct. 3375, is inapposite. As discussed below, because Foss' conversation with Delinquent constitutes "evidence favorable to the accused," the suppression of which undermines confidence in the verdict, it falls within *Brady*'s ambit. Moreover, irrespective of Foss' obligation to memorialize the conversation, Foss admitted at the evidentiary hearing that he did so, and that he informed the prosecutor of the sub-

stance of the conversation. [*See* EHT at 70–71.]

**93.** As discussed above, there is insufficient basis for concluding that the photographs taken by Foss in connection with graffiti investigation in January 1998 depicted the same graffiti as that depicted in the photographs he took during Petitioner's trial. It follows that there is no basis to conclude that the January photographs were either impeaching or exculpatory, such that their disclosure was required by *Brady.* Finally, the record indicates that Foss' report, which states that photographs were taken, was provided to Petitioner during the trial. For these reasons, the court rejects Petitioner's *Brady* claim with respect to these items.

the park only eleven days before the shooting for which Petitioner was on trial, nor Hewitt's rebuttal testimony that guns were present in the car which Petitioner was driving when arrested in 1995.

The prosecutor pointedly argued to the jury that Petitioner lied when he denied these operative facts—which were so similar to the instant case that the trial court considered the prior incidents to be "signature offenses"—and that Reyes and Hewitt, in comparison, were credible witnesses with no reason to lie. As previously discussed, the prosecutor's emphasis on the importance of the testimony is the best measure of the likely damage of the suppressed evidence to the prosecution's case. *Kyles,* 514 U.S. at 444, 115 S.Ct. 1555; *Horton,* 408 F.3d at 579–80.

Moreover, internal and investigatory records created or maintained by the prosecution or law enforcement—such as Foss' interview of Michael Reyes, Jose Reyes' gang card and police reports documenting Jose Reyes' gang status and related criminal activity, and the complaints, investigation, and discipline of Hewitt—are, by their nature, unique and potent impeachment evidence. Such evidence was not cumulative to the impeachment evidence evident in the record or used or elicited at trial.

Police reports documenting Reyes' admission that he was a BLC gang member, as well as that ammunition, a crossbow, gang graffiti and other paraphernalia was found in his bedroom only weeks after he purportedly quit the gang, patently impeached his denial that he was a BLC gang member. This evidence is not only indicative of active gang membership, it also suggests that Reyes' allegiance to BLC was elevated to the point of embracing violence. The field identification card—which cards Foss testified were created and maintained to record and track the activities and contacts of known gang members and their associates—was no less impeaching, particularly in light of Foss' testimony that he relied on such information received from the LAPD CRASH unit in forming his opinion that Petitioner was an active Temple Street gang member.[94] Moreover, evidence impeaching Reyes and Hewitt necessarily discredits Foss. Reyes' testimony and information Foss received from CRASH officers (including the report of Petitioner's 1985 arrest by Hewitt) provided context for Foss' assessment of the evidence regarding Petitioner's gang status (i.e., Petitioner's clothing and appearance when arrested, items seized from and photographs taken of his bedroom, the photograph depicting Petitioner and others flashing gang signs, and the so-called "hard candy list") as other than innocuous or indicative of the past, as urged by the defense. Moreover, evidence that Foss interviewed Delinquent not only impeaches Foss' specific testimony regarding the percipient evidence he had relating to the park shooting, but more importantly, evidences the extent of Foss' reliance on Jose Reyes' inculpatory account and willingness

---

**94.** The fact that Reyes was subject to some impeachment, and the jury nevertheless convicted Petitioner, indicates that the impeachment evidence available was insufficient to convince the jury to discredit Reyes' testimony. In such circumstances, and where the witness is critical to the prosecution, the Ninth Circuit has observed that "the suppressed impeachment evidence takes on an even greater importance." *Benn v. Lambert,* 283 F.3d 1040, 1054 (9th Cir.2002) ("Where, as here, there is reason to believe that the jury relied on a witness's testimony to reach its verdict despite the introduction of impeachment evidence at trial, and there is a reasonable probability that the suppressed impeachment evidence, when considered together with the disclosed impeachment evidence, would have affected the jury's assessment of the witness's credibility, the suppressed impeachment evidence is prejudicial.").

to discount a no less percipient account of the park shooting that tended to exculpate Petitioner.

In short, the suppressed evidence collectively would have entitled the jury to find that Hewitt's testimony was presumptively unreliable and false; that if Reyes was willing to lie about his gang status and bias, he was willing to lie about Petitioner's purported involvement in the park shooting; and that Foss' opinions—particularly regarding Petitioner's gang status and purported embracement of violence—were not trustworthy.

This is not to say, "[i]n assessing the significance of the evidence withheld ... that ... every item of the State's case would have been directly undercut if the *Brady* evidence had been disclosed." *Kyles,* 514 U.S. at 451, 115 S.Ct. 1555. However, "the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether [the court] can be confident that the jury's verdict would have been the same." *Id.* at 453, 115 S.Ct. 1555. Recap of the suppressed evidence and of its significance for the prosecution does not inspire such confidence. *See Id.*

Accordingly, following well established Supreme Court authority and contrary to the determination of the state courts, the suppression of the above evidence undermines confidence in the outcome of the trial. *Accord, Banks v. Dretke,* 540 U.S. 668, 700–03, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (concluding that evidence impeaching the uncorroborated testimony of a key prosecution witness was material for *Brady* purposes); *Kyles,* 514 U.S. at 444, 115 S.Ct. 1555 (concluding that evidence tending to impeach the reliability of the testimony of key eyewitness testimony was material); *Horton,* 408 F.3d at 578–79 (concluding that unique impeachment evidence suggesting the willingness of a critical prosecution witness to fabricate evidence was material).

## C. *Prosecutorial misconduct during closing argument*

In Claim Two, Petitioner also contends that the prosecutor improperly vouched for the credibility of Foss and Hewitt. [Pet. at 40–43; Pet. PEHB at 54–58.] In pertinent part, Petitioner challenges the following argument that to find Petitioner guilty only as an accessory after the fact, rather than as charged, the jury would have to believe not only that Zuniga and Reyes lied, but that the law enforcement witnesses did as well:

> ... You have to find that [Deputy] Foss lied or was mistaken about a number of facts in this case. About a list of facts too long to list about this defendant being a gang member ... that with his years of training and experience, [Deputy] Foss was wrong about that or came in here and intentionally lied to you about those things. You've got to find that Officer Hewitt drove 80 miles from Los Angeles to come here and lie to you. Or to be mistaken. All the tax dollars we pay Detective Foss and Officer Hewitt.
>
> ... 1
>
> But, more importantly, the defendant lied to you about what took place in Los Angeles in April of '95. He said, you know, 'I was told there was some guns in the car. I didn't know. I didn't know.'
>
> What did Officer Hewitt tell you? It was a situation where Officer Hewitt is either lying—he either drove 80 miles from Los Angeles to lie to you, or he's just so off base in his opinion as to really be, you know, I'll say it, worthless as a police officer.

[RT at 1479–80, 1495.]

Additionally, Petitioner challenges as improper the prosecutor's argument re-

garding cross-examination of Jose Reyes for bias, and in particular, whether Reyes expected some benefit for himself or Delinquent on account of his testimony:

> Well—and I guess what concerns me is that not only is Detective Foss a liar, but the prosecutor is a liar because he stood here and told you there was no deal. There was no evidence of any deal.
>
> All right. So now there is a big conspiracy because this is what happens when all of the evidence points to the defendant as being guilty. Its time for some other people to be on trial. It's time for [the prosecutor] to be on trial. Who told you there was no deal? It's time for Detective Foss to be on trial. Obviously he perjured himself. Obviously, he is willing to throw his career away for this defendant.

[RT at 1570.]

### 1. *Legal standard*

■ When a habeas petitioner asserts prosecutorial misconduct arising out of statements made during argument, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), *quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (same); *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir.2005); *Williams v. Borg*, 139 F.3d 737, 744 (9th Cir.1998). "In other words, under *Darden*, the first issue is whether the prosecutor's remarks were improper, and if so, whether they infected the trial with unfairness." *Tan*, 413 F.3d at 1112.

■ It is well settled that "[c]ounsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows

based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253–54 (9th Cir. 1996) (internal quotation marks and additional citation omitted). Thus, a prosecutor is permitted to argue reasonable inferences from the evidence and to label a witness's testimony as lies or fabrication. *Id.; see also Duckett v. Godinez*, 67 F.3d 734, 742 (9th Cir.1995); *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) (additional citations omitted).

■ A prosecutor may not, however, misstate or manipulate the evidence, *Berger v. United States*, 295 U.S. 78, 84–87, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), *overruled on other grounds, Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), or "urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking" or otherwise "encourage a jury to enter a verdict on the basis of emotion rather than fact." *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir.2005) (internal quotation marks and additional citation omitted); *accord United States v. Young*, 470 U.S. 1, 17, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (the prosecutor's exhortation to the jury to "do its job" was improper); *Sechrest v. Ignacio*, 549 F.3d 789, 811 (9th Cir.2008) (argument that the defense was a "fraud" and that jury would carry the burden of having risked the life of some person or child if they "fell" for the "fraud" incited the passions of the jury and were impermissibly inflammatory).

■ It is also improper for a prosecutor to vouch for, i.e., relate his or her personal opinion regarding the weight of the evidence or the credibility of a witness. *Young*, 470 U.S. at 18–19, 105 S.Ct. 1038 (the prosecutor's rebuttal argument that he believed the defendant intended to commit the charged fraud was an improper expression of personal opinion); *Weather-*

*spoon,* 410 F.3d at 1146 (stating that "vouching" is a type of prosecutorial misconduct which "consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony" (*quoting Necoechea,* 986 F.2d at 1276)).

◼ Challenged comments or argument made by a prosecutor must be evaluated in the context of the entire trial, as well as the context in which made. *Boyde v. California,* 494 U.S. 370, 384, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (the arguments of counsel must be judged in the context in which they were made, bearing in mind that arguments of counsel carry less weight than do instructions from the court); *Greer,* 483 U.S. at 765–66, 107 S.Ct. 3102 ("When a defendant contends that a prosecutor's question rendered his trial fundamentally unfair, it is important as an initial matter to place the remark in context" (internal quotation marks and citation omitted)); *Young,* 470 U.S. at 12, 105 S.Ct. 1038 (the challenged "remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error."); *Donnelly,* 416 U.S. at 647, 94 S.Ct. 1868 (same). Habeas relief is not available simply because a "prosecutor's remarks were undesirable or even universally condemned." *Allen v. Woodford,* 395 F.3d 979, 997 (9th Cir.2005), quoting *Darden,* 477 U.S. at 181, 106 S.Ct. 2464 (additional citation omitted). Relief will be granted only if the misconduct by itself rendered the trial fundamentally unfair. *Darden,* 477 U.S. at 181, 106 S.Ct. 2464; *Davis v. Woodford,* 384 F.3d 628, 644 (9th Cir.2004) (vouching does not violate due process unless the remarks render the trial fundamentally unfair).

### 2. *Discussion*

◼ Applying the above authority, the challenged remarks do not constitute impermissible vouching. The Ninth Circuit does not consider remarks which urge the jury to credit a prosecution witness's testimony and version of an event over that of a defense witness improper. *See Duckett,* 67 F.3d at 742 ("the prosecutor's assertions regarding the relative believability of the state and defense witnesses were not representations of his personal opinion, but inferences drawn from the evidence."); *Necoechea,* 986 F.2d at 1276 (prosecutors may argue that one version of conflicting testimony is correct).

In similar challenges to comments singling out the credibility of law enforcement officers, the Ninth Circuit has been both unforgiving, *see United States v. Combs,* 379 F.3d 564, 574 (9th Cir.2004) (prosecutor's argument that in order to acquit the defendant the jury had to believe that the case agent "is a liar:" "If you believe the defendant's version of events, you have to believe that [the case agent] walked up to that witness stand, swore to tell the truth, and perjured himself. You have to believe that [the case agent] flushed his ten-year career down the toilet."), and more lenient. *See, e.g., Duckett,* 67 F.3d at 742 ("The State's witnesses, the original officers on the scene, did they have a motive to get up there and say anything other than what they did? No. ... The officers are professional people. The came in and testified to exactly what they did, and the facts that they heard and say, and procedures that they followed."); *United States v. Molina,* 934 F.2d 1440, 1445 (9th Cir.1991) ("[S]omebody is lying. And who is that? Who's lying? Is Special Agent Reyes lying? Did he get up on the stand under oath and lie to you for the sole purpose of convicting an innocent man? It's unbelievable. ... The one who lied to you is the

one who is guilty of [the charged offense]. And that's the defendant ... [He] had a greater stake in this case ... and the greatest motive to lie.").

Whether or not the offending remarks crossed the line from proper to improper, this court cannot find that they "so infected the trial with unfairness" as to constitute a freestanding violation of due process. *Darden*, 477 U.S. at 181, 106 S.Ct. 2464. Accordingly, the state court's apparent rejection of this claim was neither contrary to, nor an unreasonable application of federal law.

### D. *Cumulative error*

In Claim Five, Petitioner contends that "[t]he errors in this case, both individually and cumulatively, rendered Petitioner's trial fundamentally unfair." [Pet. at 50–52.]

■ The Supreme Court has clearly established that "[t]he cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.2007), *citing Chambers v. Mississippi*, 410 U.S. 284, 290 n. 3, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). When assessing the combined effect of multiple errors, the court applies "traditional due process principles." *Parle*, 505 F.3d at 927 (*citing Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868). Simply stated, the court determines whether "the combined effect of individually harmless errors renders a criminal defense 'far less persuasive then it might [otherwise] have been." *Parle*, 505 F.3d at 927 (*citing Chambers*, 410 U.S. at 294, 302–03, 93 S.Ct. 1038) (alteration in original and quotation marks omitted). If so, "the resulting conviction violates due process." *Id.*

■ The court concludes that habeas relief is warranted based on the cumulative effect of the above identified constitutional errors. As succinctly put by the prosecutor at the conclusion of rebuttal argument: "This case is about three things: [It] is about knowledge ... intent ... credibility ... [and] what [Petitioner] knew and when." [RT at 1582.] In this regard, the prior bad acts evidence—of which only Jose Reyes and Hewitt testified—was repeatedly singled out by the prosecutor as evidence satisfying these elements, and as providing the context for Petitioner's alleged conduct at the time of the charged offenses:

> "Based on all of that testimony, based on all the things that you heard about in '95, based on what you heard about [the park shooting], that this defendant and his brother shared the same intent that day, October 29, 1997; that they entered into an agreement to kill a rival gang member because that is what gang members do when they were at war; ... and that the end result of that was that this defendant's brother got out of the vehicle that day and shot [the victim] ...."

[RT at 1582.]

Given the clearly articulated import of this evidence to the prosecution, revelation that the sole witnesses who provided it lied, in whole or in substantiated part, casts considerable doubt on the fairness of the trial and the resulting conviction. That Foss relied on this evidence in formulating his opinions regarding Petitioner's gang status and his conduct, without acknowledging (with respect to Jose Reyes) impeaching percipient evidence, further undermines the fairness of the trial. These errors are compounded by the prosecution's suppression of material impeachment evidence which would have demonstrably undermined the credibility not only of Hewitt and Reyes, but of Foss as well.

Finally, although not necessarily sufficient in and of itself to constitute constitutional error, the prosecutor's repeated en-

treaties crediting the testimony of these key prosecution witnesses, while simultaneously branding Petitioner a liar, also inform this conclusion. In short, the combined effect of the individual errors rendered Petitioner's defense "far less persuasive than it might otherwise have been." *Parle,* 505 F.3d at 927. Accordingly, his conviction violates due process. *Id.*

### CONCLUSION

For the above reasons, it is recommended that Petitioner's claims for habeas relief based on *Napue, Brady* and cumulative error be granted, and that Petitioner be released from custody unless, new trial proceedings are commenced within 90 days after entry of judgment.

Dated: June 10, 2009.